**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROOFERS' PENSION FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH C. PAPA and PERRIGO COMPANY PLC,<br><br>Defendants. | Civ. A. No.<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED<br><br>**ECF CASE** |

Plaintiff Roofers' Pension Fund ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by Perrigo Company plc ("Perrigo" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Perrigo; and (d) other public information regarding the Company.

## INTRODUCTION

1. This is a federal securities class action (the "Action") brought on behalf of purchasers of Perrigo's publicly traded common stock between April 21, 2015 and May 11, 2016, inclusive (the "Class Period"). This Action is also brought on behalf of all investors in Perrigo common stock as of November 13, 2015, which was the deadline for Perrigo investors to tender their shares in connection with a tender offer made by Mylan N.V. ("Mylan"). The claims asserted herein are alleged against the Company's former Chief Executive Officer, Joseph Papa, and Perrigo (collectively, "Defendants"), and arise under Sections 10(b), 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Perrigo manufactures generic drugs and other over-the-counter ("OTC") medications. On April 8, 2015, competing drug manufacturer Mylan approached the Perrigo Board of Directors with an offer to purchase Perrigo for $205 per share, representing a nearly 30% premium to the Company's total market capitalization. Mylan's approach was well received by investors, and the price of Perrigo stock increased to as high as $215 per share in intraday trading on April 8.

3. However, on April 21, 2015, the first day of the Class Period, Perrigo publicly rejected Mylan's offer and falsely told investors that it "substantially undervalues Perrigo and its growth prospects," and that the offer "does not take into account the full benefits of the Omega Pharma acquisition." Even though Mylan subsequently raised its offer to approximately $235 per share, over the next six months, Perrigo continued to engage in a public campaign to convince shareholders to reject Mylan's proposal. As additional reasons to reject Mylan's offer, Perrigo cited the 5%-10% in organic revenue growth that it would achieve as a standalone company, as well as significant synergies from Perrigo's March 2015 acquisition of a company named Omega Pharma N.V. ("Omega"), among other things.

4. These statements—which caused a majority of Perrigo's shareholders to reject Mylan's offer—were materially false and misleading. In truth, Perrigo knew, or recklessly disregarded that: (1) Mylan's offer did not undervalue Perrigo; (2) Perrigo would not be able to achieve 5%-10% organic growth as a standalone company; (3) the Company's "durable competitive position and durable growth strategy" was rapidly deteriorating; and (4) Perrigo was experiencing serious issues integrating the Omega acquisition and significantly overpaid for Omega's business.

5. Convinced by Perrigo's strong opposition to Mylan's tender offer, on November 13, 2015, the majority of the Company's shareholders declined to tender their shares making the tender offer a failure and causing the price of Perrigo shares to decline by 6% from $156.55 per share to $146.90 per share.

6. On February 18, 2016, Perrigo reported fourth quarter 2015 revenue, margins, earnings, and cash flow that were all lower than investors had been led to expect, and decreased earnings guidance for 2016. The Company also announced the sudden need to restructure parts of the Omega business, and that it would need to take a $185 million impairment charge related to Omega's assets. On this news, Perrigo shares fell $14.77 per share, or 10%, to close at $130.40 per share.

7. Then, on April 22, 2016, *Reuters* reported that Perrigo's longtime Chief Executive Officer ("CEO"), Joseph C. Papa, would be appointed as the new CEO of competing pharmaceutical company Valeant Pharmaceuticals. The reporting that CEO Papa would be leaving Perrigo after spending the better part of the prior year assuring investors of the strength of Perrigo's business caused the price of the Company's shares to fall from $128.68 per share to $121.35 per share, or almost 6%.

8. On April 25, 2016, before the market opened, Perrigo confirmed that CEO Papa was, in fact, resigning to become Valeant's new CEO. The Company also drastically lowered its earnings guidance for 2016 and announced weak preliminary first-quarter 2016 results. The Company attributed its poor financial performance to increased competitive pressures and weaker than expected performance within Omega. Finally, Perrigo disclosed issues with the integration of Omega, and that it was contemplating another impairment charge—in addition to the $185 million charge the Company took just two months prior—associated with the Omega acquisition. This news caused the price of Perrigo shares to fall an additional $21.95 per share, or 18%, from $121.35 per share to $99.40 per share.

9. On May 12, 2016, Perrigo announced a first quarter net ***loss*** of $0.93 per share, which the Company largely attributed to an additional $467 million impairment charge relating to the Omega acquisition. Following the announcement of Perrigo's financial results, the Company's newly appointed CEO—John Hendrickson—stated that the Company's "recent track record of performance against our own expectations is unacceptable." Hendrickson also indicated that he would be targeting "realistic" forecasts the Company can meet—a clear

admission that the Company had previously asserted unrealistic and unattainable financial goals in an effort to defeat Mylan's takeover during the prior year. As a result of these disclosures, Perrigo shares fell $3.71 per share, or 4%.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under Sections 10(b), 14(e), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(e), and 78t(a), and Rule 10b-5 a promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts and conduct that constitute the violations of law complained of herein occurred in this District. Defendant Papa resides in this District and has maintained a residence in this District throughout the Class Period. In addition, the Company maintains offices and operations in Piscataway and Parsippany, which are situated within this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12. Plaintiff Roofers' Pension Fund is the pension fund for the Local No. 11 of the United Union of Roofers Waterproofers & Allied Workers. Local No. 11 represents the rights of its members who work in all segments of the roofing and waterproofing industry, promoting skilled craftsmen and women through apprenticeship training. Currently, Plaintiff manages approximately $250 million in assets on behalf of approximately 3,500 participants. Plaintiff purchased shares of Perrigo stock on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

13. Defendant Joseph C. Papa ("Papa") was, from October 31, 2007 to April 24, 2016, Chairman of the Board of Directors and Chief Executive Officer of Perrigo. Papa currently resides in New Jersey and maintained a residence in New Jersey throughout the Class Period.

14. Defendant Perrigo is based in Dublin, Ireland and is incorporated under the laws of Ireland. Perrigo was initially founded in 1887 as a packager of home remedies, and has since grown to become the world's largest manufacturer of OTC healthcare products and supplier of infant formulas for the store brand market. Perrigo has significant operations in New Jersey, including a 14,000 sq. ft. Consumer Health Care R&D Center in the township of Piscataway, which Perrigo describes as a "strategic location in the hub of New Jersey's pharmaceutical industry" that "gives Perrigo a footprint in the northeast." The Company also operates a research and development facility in the township of Parsippany. The Company's common stock trades on the New York Stock Exchange, which is an efficient market, under ticker symbol "PRGO." As of February 19, 2016, Perrigo had approximately 143 million shares of stock outstanding.

15. Defendant Papa, because of his position with Perrigo, possessed the power and authority to control the contents of Perrigo's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Defendant Papa was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information available to him, Defendant Papa knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## BACKGROUND

16. Perrigo is a manufacturer of generic drugs and OTC healthcare products. In 2013, Perrigo acquired Ireland-based biotech firm Elan Corp. for $9.5 billion. As part of the acquisition, Perrigo developed a new corporate structure headquartered in Dublin, Ireland, in order to take advantage of that country's comparatively low corporate tax rate of 12.5%.

17. In the spring of 2014, Perrigo's executives engaged in informal discussions with competing OTC pharmaceutical manufacturer, Mylan, regarding a potential merger of the two companies. Those conversations, which were not publicly disclosed at the time, were preliminary and never rose to the level of a formal agreement or offer.

18. In November 2014, Perrigo announced that it had entered into an agreement to acquire Omega, one of the largest OTC healthcare companies in Europe, for $4.4 billion. At the time, Perrigo's then-Chairman and CEO, Defendant Papa, stated that the "combination of these two great companies accelerates Perrigo's international growth strategy, substantially diversifies our business streams and establishes a durable leadership position in the European OTC marketplace." The transaction closed on March 30, 2015. In conjunction with the acquisition of Omega, the Company changed its reporting segments to better align with the Company's organizational structure and created a Branded Consumer Healthcare ("BCH") segment to encompass the Omega business.

19. On April 8, 2015, however, Mylan announced that it had sent a nonbinding proposal to Perrigo's Board of Directors to purchase Perrigo for a price of $205 per share, representing a greater than 29% premium to Perrigo's sixty-day average share price. In connection with the proposal, Mylan's Executive Chairman stated that the "proposal is the culmination of a number of prior discussions between Mylan and Perrigo about the compelling strategic and financial logic of this combination" and that the "combination would result in meaningful immediate and long-term value creation." Following the announcement of Mylan's offer, Perrigo shares skyrocketed, closing up about 18% after reaching over $215 per share in intraday trading.

**PERRIGO MISREPRESENTS THE STRENGTH OF ITS BUSINESS TO DEFEND AGAINST MYLAN'S PROPOSAL**

20. The Class Period begins on April 21, 2015, the day that Perrigo's Board of Directors publicly rejected Mylan's proposal. That day, the Company issued a press release stating that Mylan's bid "substantially undervalues Perrigo and its growth prospects." In the press release, which was also filed with the SEC on Form 8-K, the Company also touted its strong competitive position, stating that Mylan's proposal "would deny Perrigo shareholders the full benefits of Perrigo's durable competitive position and compelling growth strategy." In the press release, the Company also cited the fact that the "proposal does not take into account the full benefits of the Omega Pharma acquisition" as a reason for rejecting Mylan's offer.

21. The statements and omissions set forth in ¶ 20 were materially false and misleading because Perrigo knew, or recklessly disregarded that: (1) Mylan's offer did not undervalue Perrigo; (2) the Company's "durable competitive position and compelling growth strategy" was rapidly deteriorating; and (3) Perrigo was experiencing serious issues integrating the Omega acquisition and significantly overpaid for Omega's business.

22. Following Perrigo's public rejection of its offer, on April 24, Mylan revised its offer to $60 in cash and 2.2 shares of Mylan stock, and designated the offer as a "firm intention" under the Irish Takeover Rules, a step that legally obligated Mylan to make a tender offer for Perrigo's shares. Mylan's offer was conditioned upon Mylan's receipt of at least 80% of the outstanding shares of Perrigo, which Mylan would later decrease to 50%. On April 29, Mylan raised its offer to $75 in cash and 2.3 Mylan shares per Perrigo share, which, at the time, valued Perrigo at approximately $235 per share.

23. Over the next six months, Perrigo engaged in a public campaign to convince its shareholders to reject Mylan's proposal. In support of its position, and as set forth in greater detail below, the Company cited strong organic growth, a disciplined approach to future acquisitions, and transparent, accessible corporate governance policies as the strengths behind

the business strategy and told shareholders that Perrigo had better prospects as a stand-alone company.

24. On May 6, 2015, Papa represented the Company at the Deutsche Bank Health Care Conference. During the conference, Papa continued to tout his "standalone case for the Perrigo Company" through which Perrigo would grow revenue 5% to 10% per year organically. Papa also lauded the "tremendous revenue synergies" that will come from integrating Omega into its business.

25. The statements and omissions set forth in ¶ 24 were materially false and misleading because Perrigo knew, or recklessly disregarded that: (1) Mylan's offer did not undervalue Perrigo; (2) Perrigo would not be able to achieve 5%-10% organic growth as a standalone company; and (3) Perrigo was experiencing serious issues integrating the Omega acquisition and significantly overpaid for Omega's business.

26. On June 2, 2015, Papa represented the Company at the Jefferies Global Healthcare Conference. During the conference, Papa implored investors to consider the Company's "long-term standalone strategy" which "can create value for our shareholders" when deciding whether to tender their shares to Mylan. Papa also stated that "Omega and Perrigo together were well-positioned" to achieve a "5% to 10% growth rate" and characterized the Omega acquisition as "immediately accretive."

27. The statements and omissions set forth in ¶ 26 were materially false and misleading because Perrigo knew, or recklessly disregarded that: (1) Mylan's offer did not undervalue Perrigo; (2) Perrigo would not be able to achieve 5%-10% organic growth as a standalone company; and (3) Perrigo was experiencing serious issues integrating the Omega acquisition and significantly overpaid for Omega's business.

28. On August 5, 2015, the Company held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendant Papa continued to tout the recent Omega acquisition as a key driver of the Company's future success as a stand-alone company. Specifically, Papa stated that Omega was

"tremendously important to our future" and touted the "revenue synergies and the cost of goods sold synergies in Omega." Papa also updated investors on Omega's integration, stating that Perrigo "delivered on our Omega integration plan" and "achieved great operational efficiencies and productivity improvement." Finally, CEO Papa assured investors of the Company's "continued focus on providing highly transparent financial and operational results."

29. The statements and omissions set forth in ¶ 28 were materially false and misleading because Perrigo knew, or recklessly disregarded that: (1) Mylan's offer did not undervalue Perrigo; (2) the Company's had not provided "highly transparent financial and operational results"; and (3) Perrigo was experiencing serious issues integrating the Omega acquisition and significantly overpaid for Omega's business.

30. On September 14, 2015, Mylan officially commenced its tender offer to Perrigo shareholders. Under the terms of the tender offer, Perrigo shareholders would receive $75 in cash and 2.3 Mylan ordinary shares for each Perrigo ordinary share. The deadline to tender shares was set to expire on November 13, 2015. Mylan pitched its offer to Perrigo shareholders as deciding between one of two scenarios: either accept a "highly attractive offer" including $75 in cash and participate in the "exciting potential for growth and value creation of a combined Mylan-Perrigo" or, alternatively, receive no upfront cash and risk a significant decline in the value of Perrigo's stock, while "weathering the delays and potential execution and integration risk inherent in Perrigo's standalone strategy." At the same time, Perrigo continued to promote its stand-alone strategy and denied Mylan's claims of "execution and integration risk" associated with Perrigo's business.

31. On September 17, 2015, the Company held a conference call with analysts and investors to recommend that Perrigo shareholders reject Mylan's tender offer. During the conference call, Papa stated that Mylan's "current offer on the table is not even in the right ZIP code, when compared to Perrigo's stand-alone value." Papa also reiterated the Company's success with the Omega acquisition, stating that the "Omega transaction . . . has done outstanding." Papa also touted that Perrigo has "consistently demonstrated [its] ability to

execute on value-accretive deals" including "expansive acquisitions like Omega" and has "been consistent in [its] drive to deliver shareholder value through inorganic growth." In addition, Papa assured investors that "[i]n one year, when you look at Perrigo, you will see a bigger, stronger company delivering value well above Mylan's offer today."

32. The statements and omissions set forth in ¶ 31 were materially false and misleading because Perrigo knew, or recklessly disregarded that: (1) Mylan's offer did not undervalue Perrigo; (2) Perrigo would not be able to achieve 5%-10% organic growth as a standalone company; (3) the Company's "durable competitive position and compelling growth strategy" was rapidly deteriorating; and (4) Perrigo was experiencing serious issues integrating the Omega acquisition and significantly overpaid for Omega's business.

33. That same day, in an effort to further convince Perrigo investors to reject the tender offer, Perrigo filed a lawsuit against Mylan in Federal court in Manhattan accusing Mylan of misrepresenting the proposed benefits of a merger with Mylan.

34. On November 13, 2016, convinced by Perrigo's strong opposition to Mylan's tender offer, the majority of the Company's shareholders declined to tender their shares making the tender offer a failure. As a result of the rejection of the tender offer, the price of Perrigo shares fell by 6% from $156.55 per share to $146.90 per share.

35. In total, Perrigo spent nearly $87 million to fight off the takeover and steadfastly claimed the deal was not in the best interests of its shareholders. After staving off Mylan's bid, Perrigo's top executives—including Papa—were rewarded with cash and stock bonuses totaling $3.5 million for "their key contributions related to Mylan's takeover attempt."

## THE TRUTH IS REVEALED

36. On February 18, 2016, Perrigo stunned investors when it reported fourth quarter 2015 revenue, margins, earnings, and cash flow that were all lower than investors had been led to expect. The Company also decreased earnings guidance for 2016, which it had provided only five weeks prior, and revealed the sudden need to restructure parts of the recently-acquired BCH

segment—which is entirely comprised of Omega. The Company also announced an impairment charge of approximately $185 million related to assets acquired in conjunction with the Omega acquisition, because the "fair value of certain acquired branded consumer healthcare brands was below the carrying value." News of the poor financial results and sudden impairment of Omega shocked investors, who had been repeatedly assured of the Company's strong financial condition and prospects. As a result of these disclosures, the price of Perrigo shares fell $14.77 per share, or 10%, to close at $130.40 per share.

37. Then, on April 22, 2016, *Reuters* and other news services reported that Perrigo's longtime CEO Papa would be appointed as the new CEO of competing pharmaceutical company Valeant Pharmaceuticals. According to *Reuters*, Valeant was negotiating a contract with Papa and planned to announce his appointment as soon as the following week. In response to these reports, Perrigo issued a press release stating only that it would not comment on "speculation or market rumor." The news reports that Papa would be leaving Perrigo after spending the better part of the prior year assuring investors of his long-term vision and strategy for the Company caused the price of Perrigo shares to fall $7.33 per share, or 5.7%, from $128.68 per share to $121.35 per share.

38. Just days later, on April 25, 2016, before the market opened, Perrigo confirmed that CEO Papa was, in fact, resigning to become the new CEO of Valeant. To make matters worse, the Company drastically lowered its earnings guidance for 2016 and announced weak preliminary first-quarter 2016 results. Specifically, Perrigo announced first-quarter earnings per share guidance of $1.71 to $1.77, compared with the $1.89 per share investors had been led to expect. The Company also significantly lowered its 2016 earnings guidance from $9.50 to $9.80 per share—which Perrigo had announced just two months earlier—down to only $8.20 and $8.60 per share, a decline of nearly 14%. The Company attributed its poor financial results to increased competitive pressures in its prescription drug segment and weaker than expected performance within Omega, weakness that the Company told investors to expect for at least the next three quarters. Finally, Perrigo revealed ongoing issues with the integration of Omega and

that it was contemplating another impairment charge—in addition to the $185 million charge the Company took just two months prior—associated with Omega.

39. Analysts and market commentators immediately questioned Perrigo's prior representations about the strength of its competitive position and the success of the Omega acquisition. Specifically, in the wake of these disclosures, "Mad Money" host Jim Cramer stated that "Papa had come on 'Mad Money' and talked about how the Mylan bid dramatically undervalued Perrigo . . . That was clearly untrue." Cramer also noted his concern over Papa's decision to depart "under what is probably a terrible moment for Perrigo." Similarly, Wells Fargo analysts downgraded Perrigo stock, noting that "Perrigo management set unrealistic and aspirational earnings guidance in its effort to defend against Mylan's hostile bid." As a result of these disclosures, Perrigo shares fell $21.95 per share, or 18%, erasing $3.1 billion in market value.

40. Then, on May 12, 2016, Perrigo announced a first quarter net ***loss*** of $0.93 per share (which the Company later revised to a loss of $2.34 per share), which the Company largely attributed to an additional $467 million impairment charge relating to the Omega acquisition. Combined with the earlier impairment charge of $185 million, the Company has now written down the value of Omega by over $650 million, just months after hyping the success of the Omega business in an effort to stave off Mylan's tender offer. Later that same day, the Company's newly appointed CEO—John Hendrickson—stated that the Company's "recent track record of performance against our own expectations is unacceptable." Hendrickson also indicated that he would be targeting "realistic" forecasts the Company can meet—a clear admission that the Company and its former CEO had previously asserted unrealistic and unattainable financial goals in an effort to defeat Mylan's takeover during the prior year. As a result of these disclosures, Perrigo shares fell an additional $3.71 per share, or 4%.

## LOSS CAUSATION

41. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Perrigo common stock and operated as a fraud or deceit on the Class. In addition, Defendants made additional false and misleading statements in response to the Mylan tender offer that had the effect of dissuading investors from tendering their shares and causing the tender offer to fail, resulting in the decline of Perrigo's common stock price. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on February 18, 2016, April 22, 2016, April 25, 2016, and May 12, 2016, the price of Perrigo common stock fell precipitously. As a result of their purchases of Perrigo common stock during the Class Period, and their inability to tender their shares to Mylan, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

42. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Perrigo during the Class Period. This Action is also brought on behalf of all investors in Perrigo common stock as of November 13, 2015, which was the deadline for Perrigo investors to tender their shares in connection with Mylan's tender offer (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Perrigo and their families and affiliates.

43. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of February 19, 2016, Perrigo had approximately 143 million shares of stock outstanding, owned by many thousands of investors.

44. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e) Whether the price of Perrigo common stock was artificially inflated;

(f) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) The extent of damage sustained by Class members and the appropriate measure of damages.

45. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

46. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

47. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

48. Perrigo's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

49. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Perrigo who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such

assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

50. At all relevant times, the market for Perrigo's common stock was an efficient market for the following reasons, among others:

(a) Perrigo stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b) As a regulated issuer, Perrigo filed periodic public reports with the SEC and the New York Stock Exchange;

(c) Perrigo regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Perrigo was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

51. As a result of the foregoing, the market for Perrigo securities promptly digested current information regarding Perrigo from all publicly available sources and reflected such information in the price of Perrigo stock. Under these circumstances, all purchasers of Perrigo common stock during the Class Period suffered similar injury through their purchase of Perrigo common stock at artificially inflated prices and the presumption of reliance applies.

52. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Perrigo's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Perrigo's financial performance in the context of Mylan's tender offer, as set forth above, that requirement is satisfied here.

## COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

53. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Perrigo common stock at artificially inflated prices.

55. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Perrigo common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

57. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Perrigo's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

59. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Perrigo common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Perrigo common stock had been artificially inflated by Defendants' fraudulent course of conduct.

60. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

61. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against Defendant Papa

62. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

63. Defendant Papa acted as a controlling person of Perrigo within the meaning of Section 20(a) of the Exchange Act. By virtue of his high-level position, participation in and/or

awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and his power to control public statements about Perrigo, Defendant Papa had the power and ability to control the actions of Perrigo and its employees. By reason of such conduct, Defendant Papa is liable pursuant to Section 20(a) of the Exchange Act.

**COUNT III**

**For Violations of Section 14(e) of the Exchange Act Against All Defendants**

64. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

65. Section 14(e) provides: "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."

66. Defendants' conduct violated their respective obligations under Section 14(e) because Defendants made the false statements and omissions set forth above concerning the strength of Perrigo's business in connection with Mylan's tender offer.

67. Those misstatements and omissions were material, in that a reasonable investor would have deemed those facts important in determining whether to tender its shares of Perrigo stock in connection with the tender offer.

68. Defendants intentionally or recklessly engaged in acts, practices, and a course of conduct that was fraudulent, deceptive or manipulative when issuing their false statements in violation of Section 14(e) of the Exchange Act.

69. As a direct and proximate result of Defendants' violations of Section 14(e) of the Exchange Act, Plaintiffs and the Class incurred significant damages.

70. By reason of such conduct, Defendants are liable pursuant to Section 14(e) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 18, 2016

**LOWENSTEIN SANDLER LLP**

*/s/ Michael B. Himmel*

Michael B. Himmel
Michael T.G. Long
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
mhimmel@lowenstein.com
mlong@lowenstein.com

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Gerald H. Silk (*Pro hac vice application forthcoming*)
Avi Josefson (*Pro hac vice application forthcoming*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Roofers' Pension Fund and Proposed Counsel for the Class*

# EXHIBIT A

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Julie A. Rachal, on behalf of Roofers' Pension Fund ("Chicago Roofers"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Fund Manager of Chicago Roofers. I have reviewed the complaint and authorize its filing.

2. Chicago Roofers did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Chicago Roofers is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Chicago Roofers' transactions in the Perrigo Company plc securities that are the subject of this action are set forth in the chart attached hereto.

5. Chicago Roofers has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. Chicago Roofers will not accept any payment for serving as a representative party on behalf of the Class beyond Chicago Roofers' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17 day of May, 2016.

Julie A. Rachal
Fund Manager
*Roofers' Pension Fund*

**Roofers' Pension Fund**
**Transactions in Perrigo Company plc**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 11/13/2015 | 306 | 146.8828 |
| Purchase | 01/11/2016 | 375 | 140.1800 |
| Purchase | 01/14/2016 | 281 | 146.0369 |
| Sale | 04/23/2015 | (419) | 200.1765 |
| Sale | 02/18/2016 | (332) | 130.4439 |
| Sale | 04/25/2016 | (1,321) | 109.3607 |
| Sale | 05/02/2016 | (1,355) | 95.3308 |