## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ROOFER'S PENSION FUND, et al.,** | |
| *Plaintiffs*, | Civil Action No. 16-2805 |
| **v.** | **OPINION** |
| **PAPA, et al.,** | |
| *Defendants.* | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of Lead Plaintiff Perrigo Institutional Investor Group's ("Lead Plaintiff") Motion for Class Certification. ECF No. 163. Defendants Perrigo Company plc ("Perrigo" or the "Company"), Joseph C. Papa, and Judy Brown (collectively, "Defendants") oppose the Motion. ECF No. 189. For the reasons set forth herein, Lead Plaintiff's Motion is **GRANTED**.

## I.    BACKGROUND[1]

Lead Plaintiff filed this putative securities class action on behalf of investors who purchased Perrigo common stock between April 21, 2015 and May 3, 2017, both dates inclusive (the "Class Period"). The claims arise from alleged misrepresentations Defendants made to investors to falsely inflate Perrigo's stock value in the face of a hostile tender offer from a competitor. Plaintiff seeks to certify the following three classes: (1) investors who purchased Perrigo stock during the Class Period on the New York Stock Exchange ("NYSE"); (2) investors who purchased Perrigo stock during the Class Period on the Tel Aviv Stock Exchange ("TASE");

---

[1] At this stage in the litigation, the Court assumes the parties' familiarity with the operative facts and thus briefly summarizes the background.

and (3) investors who owned Perrigo stock as of November 12, 2015 until the time a tender offer expired.

Defendant Perrigo is a publicly-traded pharmaceutical company. Am. Compl. ¶ 30. Perrigo's common stock is dual listed on the NYSE and the TASE. Id. ¶ 31. Joseph Papa and Judy Brown (collectively, the "Individual Defendants")[2] were corporate executives at Perrigo when the relevant misrepresentations occurred. See id. ¶¶ 32, 34.

Lead Plaintiff Perrigo Institutional Investor Group is a group of investors comprised of the following corporate entities: Migdal Insurance Company Ltd. ("Migdal Insurance"), Migdal Makefet Pension and Provident Fund Ltd. ("Migdal Makefet" and, with Migdal Insurance, "Migdal"), Clal Insurance Company Ltd. ("Clal Insurance"), Clal Pension and Provident Ltd. ("Clal Pension"), Atudot Pension Fund for Employees and Independent Workers Ltd. ("Atudot" and, with Clal Insurance and Clal Pension, "Canaf-Clal"), and Meitav DS Provident Funds and Pension Ltd. ("Meitav"). ECF No. 64. Migdal is one of the largest insurance and pension managers in Israel, and each of the Migdal entities purchased Perrigo stock during the Class Period, including on the TASE. Id. ¶ 27. Canaf-Clal comprises Israeli investment entities, each of which purchased Perrigo shares during the Class Period, including on the TASE. Id. ¶ 28. Meitav is an affiliate of a leading Israel investment firm and purchased Perrigo shares during the Class Period, including on the TASE. Id. ¶ 29.

Plaintiff's Amended Complaint alleges violations of Section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), and Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), against all Defendants, and violations of

---

[2] The Court dismissed several other individual defendants—all former corporate executives and members of Perrigo's Board of Directors—from the case pursuant to its July 27, 2018 Order and Opinion.

Section 20(a) of the Exchange Act, id. § 78t(a), against the Individual Defendants.  The TASE Investors further allege violations of the Israel Securities Law, 1968 against all Defendants.

The Class Period begins on April 21, 2015, approximately two weeks after pharmaceutical conglomerate Mylan—a Perrigo competitor—made an unsolicited bid to purchase Perrigo for approximately $205 per share.  Am. Compl. ¶¶ 1, 92.  Perrigo's Board of Directors rejected Mylan's offer and announced that the bid "substantially undervalue[d] the Company and its future growth prospects."  See id. ¶ 96.  Mylan twice increased its bid proposal to Perrigo, but the Board rejected both revised offers.  Id. ¶¶ 103-04.  Mylan thereafter proceeded with a formal tender offer to Perrigo's shareholders.  Id. ¶ 107.

Perrigo's shareholders ultimately rejected Mylan's tender offer on November 13, 2015.  See id. ¶¶ 107, 111.  Approximately two months after the tender offer failed, Defendants announced Perrigo's fourth quarter and 2015 calendar year financial results, which were lower than projected.  See id. ¶¶ 9, 225-26.  Perrigo stock continued to fall over the course of the next few months.  See id. ¶¶ 10-11, 227-29.  By December 2016, Perrigo stock values declined significantly to $81.94 per share.  Id. ¶¶ 17, 238.

The class action claims stem from alleged material misrepresentations and omissions that Defendants made to overvalue Perrigo and prevent its shareholders from accepting Mylan's offer.  Defendants filed a Motion to Dismiss, which this Court granted in part and denied in part in a written opinion issued on July 27, 2018.  ECF Nos. 114, 136-37.  The surviving claims are premised upon misrepresentations and omissions relating to two key areas:  (1) collusive pricing for generic drugs; and (2) the integration of Omega Pharma, N.V. ("Omega").[3]

---

[3] The Court concluded that Lead Plaintiff failed to adequately plead scienter with respect to all claims based upon misrepresentations relating to:  (1) the value of a royalty stream for the drug Tysabri; and (2) Perrigo's organic growth rates.  Those claims were dismissed pursuant to the Court's July 27, 2018 Opinion and Order.  ECF Nos. 136-37.

First, Lead Plaintiff alleges that Perrigo engaged in a price-fixing scheme with other generic drug manufacturers and that Defendants made material misrepresentations that omitted their price-collusion practices. The second set of misstatements relates to the integration of an acquired company. Shortly before the Class Period commenced in 2015, Perrigo acquired Omega—one of the largest over-the-counter healthcare companies in Europe. Am. Compl. ¶ 53. Plaintiff alleges that Defendants misrepresented the success of Omega's integration and inflated Omega's growth prospects while omitting numerous known impediments. The Court dismissed certain Omega claims predicated upon alleged misrepresentations that included puffery and forward-looking statements but sustained the claims based upon misrepresentations relating to the past and present success of the integration. ECF No. 136.

Plaintiff filed this action on May 18, 2016. ECF No. 1. The Court appointed Lead Plaintiff and its counsel on April 27, 2017. ECF No. 85. Plaintiff filed an Amended Complaint on June 21, 2017. ECF No. 89. On July 27, 2018, this Court issued an Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss the Amended Complaint, as set forth above. ECF Nos. 136, 137. Plaintiff now seeks to certify three separate classes of Perrigo investors under Federal Rule of Civil Procedure 23(b)(3): (1) investors who suffered damages resulting from the purchase of Perrigo stock on the NYSE during the Class Period; (2) investors who suffered damages resulting from the purchase of Perrigo stock on the TASE during the Class Period; and (3) investors who held Perrigo stock as of November 12, 2015 until Mylan's tender offer expired.

## II.    LEGAL STANDARD

### A.    Class Certification Requirements

A plaintiff seeking class certification must show that the class meets the requirements of Federal Rule of Civil Procedure 23. Rule 23(a) sets forth four basic prerequisites for class

certification:  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.  See Fed. R. Civ. P. 23(a); In re Constar Int'l Inc. Sec. Litig., 585 F.3d 774, 780 (3d Cir. 2009).  If the plaintiff meets those requirements, the Court must then decide whether the class action is maintainable under Rule 23(b).  Rule 23(b)(3) authorizes certification when "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  See Fed. R. Civ. P. 23(b).  The predominance requirement is generally the most crucial requirement in class actions involving securities violations.  See Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II), 573 U.S. 258, 276 (2014).

A plaintiff "must affirmatively demonstrate" that the Rule 23's requirements are satisfied, Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011), by a preponderance of the evidence, In re Blood Reagents Antitrust Litig., 783 F.3d 183, 187 (3d Cir. 2015).  In deciding whether to grant a class certification motion, the Court's analysis frequently overlaps with "the merits of the plaintiff's underlying claim," Dukes, 564 U.S. at 351, but the Court may consider the merits "only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied," Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013).

### B.    Elements of Substantive Claims

The Amended Complaint alleges violations of Sections 10(b), 14(e), and 20(a) of the Exchange Act, 15 U.S.C. § 78a et seq.  Section 14(e) is modeled after Section 10(b), Schreiber v. Burlington N., Inc., 472 U.S. 1, 10 (1985), and Section 20(a) is a derivative claim predicated on finding Section 10(b) liability, see Rahman v. Kid Brands, Inc., 736 F.3d 237, 247 (3d Cir. 2013).  Thus, an analysis of Lead Plaintiff's Section 10(b) claims will determine the viability of its Section 20(a) claim and will inform the viability of its Section 14(e) claim.

Section 10(b) and Rule 10b-5 prohibit deception in connection with the sale or purchase of securities. To recover damages for securities fraud, a plaintiff must prove the following elements: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 167 (3d Cir. 2014).

At the class certification stage, the Court need not consider materiality and loss causation but must consider reliance. See Amgen, 568 U.S. at 473 (materiality); Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I), 563 U.S. 804, 812-13 (2011) (loss causation); Halliburton II, 573 U.S. at 266-68 (reliance). To establish reliance, a plaintiff may invoke the rebuttable presumption set forth in Basic, Inc. v. Levinson, that all investors rely on the integrity of the market price when deciding whether to buy or sell stock. 485 U.S. 224, 246-47 (1988). The Basic presumption of reliance is based on the "fraud-on-the-market" theory, which provides that where a company's stock trades on an efficient market, its stock price incorporates all material public information, including misrepresentations. See id. at 246-47 (internal quotation marks and citations omitted). A plaintiff bears the burden to invoke the Basic presumption by showing: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." Halliburton II, 573 U.S. at 268.

If the plaintiff meets that initial burden, the defendant may rebut the presumption by making "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." Basic, 485 U.S. at 248. To satisfy this standard, the defendant must produce "enough evidence 'to withstand

6

a motion for summary judgment or judgment as a matter of law on the issue.'" <u>Bing Li v. Aeterna Zenatalis, Inc.</u>, 324 F.R.D. 331, 344 (D.N.J. 2018) (quoting <u>Lupyan v. Corinthian Colleges, Inc.</u>, 761 F.3d 314, 320 (3d Cir. 2014)).

## III.    ANALYSIS

Lead Plaintiff moves to certify three separate classes.  First, Lead Plaintiff seeks to certify a class consisting of "[a]ll persons who purchased Perrigo's publicly traded common stock between April 21, 2015 and May 2, 2017, both dates inclusive . . . on the . . . NYSE . . . or any other trading center within the United States, and were damaged thereby" (the "U.S. Purchaser Class").  ECF No. 163.1 at 2.  Second, Plaintiff seeks to certify a class consisting of "[a]ll persons who purchased Perrigo's publicly traded common stock during the Class Period on the . . . TASE . . . and were damaged thereby" (the "TASE Purchaser Class").  <u>Id.</u>  Finally, Plaintiff seeks to certify a class consisting of "[a]ll persons who owned Perrigo common stock as of November 12, 2015 and held such stock through at least 8:00 a.m. on November 13, 2015, when the tender offer of [Mylan] expired unsuccessfully (whether or not a person tendered their shares)" (the "Tender Offer Class").  <u>Id.</u>

Defendants assert a single challenge to Rule 23(a)'s requirements against all proposed classes.  In each instance, Defendants challenge only Rule 23(a)'s typicality and adequacy requirements.  Under Rule 23(b), Defendants argue that predominance is lacking for reasons specific to each proposed class.  Defendants do not challenge Rule 23(b)'s superiority requirement for any class.  Accordingly, the Court will address whether the proposed classes together meet Rule 23(a) and then separately consider whether each proposed class satisfies Rule 23(b)'s requirements.

A.    **Rule 23(a)'s Requirements**

1.    **Numerosity and Commonality**

Defendants do not challenge class certification on numerosity or commonality grounds. The Court is satisfied that those requirements are met here.

The numerosity requirement is satisfied when "the class is so numerous that joinder of all members is impracticable." In re Modafinil Antitrust Litig., 837 F.3d 238, 249 (3d Cir. 2016) (quoting Fed. R. Civ. P. 23(a)(1)). Joinder is often impractical in securities fraud cases involving publicly-owned and nationally-listed corporations that had a large amount of outstanding and traded shares during the relevant class period. See In re Vivendi Universal, S.A. Sec. Litig., 242 F.R.D. 76, 84 (S.D.N.Y. 2007). In addition, the numerosity requirement "is readily met in securities cases involving an issuer whose stock trades publicly on the NYSE." City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., No. 12-5275, 2015 WL 5097883, at *8 (D.N.J. Aug. 31, 2015).

Perrigo is a publicly traded company with more than 100 million shares outstanding and an average weekly trading volume of approximately 9.5 million shares on the NYSE during the Class Period. See Expert Report of Zachary Nye, Ph.D. (Nov. 30, 2018) ("Nye Report"), ECF No. 163.2, at ¶ 20. Perrigo stock also traded on the TASE during the same period. Compare id. at Ex. 4A with id. at Ex. 4B. In addition, more than 100 million shares were outstanding as of November 2, 2015, shortly before Mylan's tender offer expired on November 13, 2015. Id. Ex. 4A. Defendants do not contest the relative size of the putative classes. The Court is satisfied that joinder is impracticable, and Lead Plaintiff meets the numerosity requirement.

Commonality requires Lead Plaintiff to "share at least one question of fact or law with the grievances of the prospective class." Rodriguez v. Nat'l City Bank, 726 F.3d 372, 382 (3d Cir.

2013); see Fed. R. Civ. P. 23(a)(2). "[C]ourts in this [C]ircuit . . . have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made misrepresentations that inflated the price of its stock." Bing Li, 324 F.R.D. at 339 (internal quotation marks and citation omitted). The Court concludes that this standard is easily met in this case. The class claims are predicated upon the same underlying misrepresentations and omissions by Defendants, presenting common issues of both fact and law arising thereunder.

### 2. Typicality

The typicality requirement "centers on whether the interests of the named plaintiffs align with the interests of the absent members." Stewart v. Abraham, 275 F.3d 220, 227 (3d Cir. 2001). The standard for demonstrating typicality is undemanding and requires that "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183-84 (3d Cir. 2001). It does not require that the putative class members all share identical claims. In re Warfarin Sodium Anitrust Litig., 391 F.3d 516, 531-32 (3d Cir. 2004). Rather, so long as the named plaintiffs and putative class challenge "the same unlawful conduct" the typicality requirement is "usually satisf[ied] . . . irrespective of the varying fact patterns underlying the individual claims." Stewart, 275 F.3d at 227 (citation omitted); see also In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 598 (3d Cir. 2009) ("Complete factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of the other class members will be fairly and adequately protected in their absence.").

The named plaintiff, however, "must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation." Id. at 599.

Defendant bears the burden to "show some degree of likelihood a unique defense will play a significant role at trial." Beck v. Maximus, Inc., 457 F.3d 291, 300 (3d Cir. 2006). Speculative defenses will not suffice. See id. at 301.

Defendants do not contest that Lead Plaintiff challenges the same unlawful conduct affecting the putative class members. Defendants instead assert that Lead Plaintiff is subject to an atypical defense, namely that Lead Plaintiff "potentially relied on information other than the misrepresentations alleged in the Amended Complaint in deciding to not tender in response to Mylan's offer." Defendant's Memorandum of Law in Opposition to Motion for Class Certification ("Defs. Br."), ECF No. 189, at 35. As support, Defendants cite to testimony of plaintiff members, admitting to "closed-door meetings" with at least two Mylan corporate officers. Id. at 36.

At their depositions, three plaintiff members testified to attending one or more meetings wherein Mylan officers discussed the Company's tender offer. See, e.g., ECF No. 189.37 at 112:13-23 (Canaf-Clal—one meeting); ECF No. 189.39 at 73:3-11, 76:17-77:11 (Meitav—two meetings); ECF No. 189.41 at 53:4-17 (Migdal—one meeting). Without further describing the substance of their conversations, two of those members testified that Mylan tried to convince them to tender. See ECF No. 189.37 at 113:19-24; ECF No. 189.41 at 53:18-22. One merely stated that the meetings' purpose was to "understand the Mylan view." ECF No. 189.39 at 73:3-11. Defendants contend that Lead Plaintiff is subject to a unique defense based on those statements because the Mylan meetings "raise serious questions" about whether Lead Plaintiff "relied on information unavailable to other members of the proposed classes" and claim this issue "will become a major focus of litigation."[4] Defs. Br. at 37-38.

---

[4] Defendants also submit a news article for proof that another Mylan meeting occurred. See Defs. Br. at 36-37; ECF No. 189.44 at 2. But that article merely reports that Mylan planned to "make [its] case for buying Perrigo in front of . . . Migdal Insurance." ECF No. 189.44 at 2. Because it describes a potential meeting—not one that had already

Defendants unique-defense argument is speculative and therefore will not bar a finding of typicality.  See Beck, 457 F.3d at 301.  Courts in this District have held that evidence of private communications with corporate officers does not disqualify a named plaintiff from serving as a class representative; rather, there must be evidence that the named plaintiff received non-public information during those communications.  See A.F.I.K. Holding SPRL v. Fass, 216 F.R.D. 567, 576 (D.N.J. 2003) (explaining that direct and personal contacts with corporate insiders is generally not a disqualifying unique defense "in the absence of evidence that the named plaintiff received non-public information from a corporate officer"); In re DVI Inc. Sec. Litig., 249 F.R.D. 196, 202-03 (E.D. Pa. 2008) (adopting the "majority view" that "mere communication with corporate insiders will not render a class representative atypical for class certification purposes absent the exchange of non-public information").  Here, general statements about Mylan encouraging Lead Plaintiff to tender is not alone sufficient to establish a disqualifying unique defense.  Defendants have not proffered any non-public information Mylan disclosed to Lead Plaintiff on which Lead Plaintiff may have potentially relied in deciding whether to tender.  Without any evidence indicating that Lead Plaintiff received non-public information during its meetings with Mylan, the Court cannot find that Lead Plaintiff's potential reliance on non-public information is a unique defense that will likely "play a significant role at trial."  Beck, 457 F.3d at 300.  Typicality is thus satisfied.[5]

---

occurred—the article does not support a finding that Lead Plaintiff received and relied on information unavailable to other class members.

[5] Defendants' one-paragraph assertion that "Meitav's prominent role in a[ ] conflicting, ongoing securities fraud litigation against Mylan" gives rise to a unique defense is without merit to warrant discussion.  See Beck, 457 F.3d at 300 ("If a court determines an asserted unique defense has no merit, the defense will not preclude class certification.").  Defendant fails to explain how this separate lawsuit involving one of the entities constituting Lead Plaintiff is likely to become a major focus in the instant litigation.  See Defs. Br. at 37-38.

### 3.     Adequacy

The adequacy requirement requires a showing that a named plaintiff "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Class representatives must be part of the class and possess the same interest and suffer the same injury as the class members." Beneli v. BCA Fin. Servs., Inc., 324 F.R.D. 89, 98 (D.N.J. 2018) (citation omitted). Determining adequacy involves a two-part inquiry: (1) "the named plaintiff's interests must be sufficiently aligned with the interests of the absentees;" and (2) "the plaintiff's counsel must be qualified to represent the class." Id. at 98. A named plaintiff is adequate if their interests do not conflict with those of the class members. Id. Here, Defendants challenge the adequacy of Lead Plaintiff but not the adequacy of counsel. Upon review of the exhibits demonstrating counsel's credentials, the Court is satisfied that counsel is qualified to represent the Classes.

Defendants challenge Lead Plaintiff's adequacy on multiple grounds. First, Defendants argue that Lead Plaintiff is inadequate because members of the group purchased Perrigo stock after the fraud was revealed. See Defs. Br. at 30. Citing only two out-of-District cases, Defendants submit that "[c]ourts have held that lead plaintiffs who have increased their holdings after disclosure of the alleged fraud fail to meet Rule 23(a)(4)'s adequacy requirement." Defs. Br. at 29-30 (citing In re Safeguard Scientifics, 216 F.R.D. 577 (E.D. Pa. 2003) and Rocco v. Nam Tai Elecs., Inc., 245 F.R.D. 131, 134-36 (S.D.N.Y. 2007)). However, at least one court in this District has ruled that post-disclosure purchases need not preclude class certification where the purchases had "no bearing on whether or not [the investors] relied on the integrity of the market during the class period." In re Merck & Co., Inc. Sec., Derivative & ERISA Litig., Nos. 05-1151, 05-2367, 2013 WL 396117, at *7 (D.N.J. Jan. 30, 2013).

Moreover, the outcome in Rocco does not represent a bright-line rule in the Southern District of New York.  In fact, a more recent case in that district reached the opposite conclusion.  See In re Moody's Corp. Sec. Litig., 274 F.R.D. 480, 488 (S.D.N.Y. 2011) ("The decision to purchase shares after a fraud is revealed does not necessarily give rise to . . . an inference" that an investor "did not rely on the alleged misrepresentations in his initial purchasing decisions[.]").  The Court declines to employ the categorical approach urged by Defendants.  Instead, the Court finds more persuasive the tailored reasoning advanced in Merck and Moody's, which considers whether post-disclosure purchases defeat an investor's reliance on fraudulent statements at the time of the initial purchases.

Here, multiple plaintiff members testified that they purchased stock to take advantage of lower prices for Perrigo shares following the disclosures.  See, e.g., ECF No. 199.8 at 107:9-21; ECF No. 199.14 at 113:23-115:11.  Doing so has been regarded as a "common investment strategy that decreases the average cost of an investment and . . . . does not in any way implicate a shareholder's initial decision to purchase stock."  Moody's, 274 F.R.D. at 488.  Defendants have failed to demonstrate that those post-disclosure purchases negate or even undermine Lead Plaintiff's allegations that its members relied on the relevant misrepresentations when they made stock-purchasing decisions during the Class Period.  Accordingly, the Court declines to find Lead Plaintiff inadequate on these grounds.

Defendants next argue that Lead Plaintiff is inadequate because its members fail to meaningfully participate in the litigation and are instead serving as "[m]outhpieces for '[l]awyer [d]riven' [l]itigation."  See Defs. Br. at 31.  It is well-settled that "a class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard."  See City Select Auto Sales, Inc. v. David Randall Assocs., Inc., 296 F.R.D. 299, 316 (D.N.J. 2013) (internal

quotation marks omitted).  Courts have found lead plaintiffs inadequate in scenarios where, for example, "a court could well conclude . . . that the members of [the movant] 'group' could not be counted on to monitor counsel in a sufficient manner." Stires v. Eco Sci. Sols., Inc., Nos. 17-3707, 17-3760, 17-5161, 2018 WL 5784817, at *5 (D.N.J. Feb. 14, 2018).  That is not the case here.

A class representative's knowledge of the litigation need not be extensive.  Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 370-74 (1966) (finding the plaintiff to be adequate even though "she did not understand the complaint at all, . . . could not explain the statements made in the complaint, . . . had a very small degree of knowledge as to what the lawsuit was about, . . . did not know any of the defendants by name, [and] . . . did not know the nature of their alleged misconduct"); Carney v. Goldman, No. 15-00260, 2018 WL 2441766, at *13 (D.N.J. May 30, 2018) ("A proposed representative's lack of particularized knowledge concerning the dispute at issue 'does not render [a class representative] inadequate . . . [if] she has retained adequate counsel to represent her'" (quoting Szczubelek v. Cendant Mortg. Corp., 215 F.R.D. 107, 120 (D.N.J. 2003).).  This is especially true in complex securities cases, which are, by their nature "attorney-driven litigation." Bing Li, 324 F.R.D. at 342 (citation omitted).

Lead Plaintiff here has demonstrated an appropriate level of familiarity with this litigation to satisfy the adequacy requirement.  Several plaintiff members appeared for depositions and testified about the extent to which they corresponded with counsel about this case, describing telephone conversations, email exchanges, and in-person meetings. See, e.g., ECF No. 199.13 at 14:13-21, 18:3-13; ECF No. 199.14 at 12:24-14:9, 77:2-5, 77:9-22; ECF No. 199.16 at 11:10-24, 42:2-43:25, 74:15-24, 83:13-85:21.  Importantly, those members testified that they had reviewed and discussed the relevant pleadings and discovery relevant to this matter, indicating their general understanding of the allegations and issues in dispute. See, e.g., ECF No. 199.13 14:21-8; ECF

No. 199.14 12:7-25, 14:11-15:21; ECF No. 199.16 at 11:8-17, 40:21-42:8. Their testimony is enough to show Lead Plaintiff's knowledge of and participation in this matter. See In re Processed Egg Prods. Antitrust Litig., 312 F.R.D. 171, 181 (E.D. Pa. 2015).

Lead Plaintiff has demonstrated the required "minimal degree of knowledge" about this litigation and, critically, retained adequate counsel to represent the class members interests. See City Select Auto Sales, Inc., 296 F.R.D. at 316. The Court thus finds that Lead Plaintiff will fairly and adequately protect the interests of the class, and the adequacy requirement is satisfied.

**B.    Rule 23(b)(3)'s Requirements**

Having found that Lead Plaintiff satisfied each of Rule 23(a)'s necessary prerequisites for class certification, the Court now turns to whether the class action is maintainable under Rule 23(b)(3). As noted above, Defendants challenge class certification on predominance grounds only, raising arguments particular to each proposed class. Accordingly, the Court briefly assesses whether the superiority requirement is satisfied and then considers, in turn, whether each proposed class meets the predominance requirement.

**1.    Superiority**

A party seeking class certification under Rule 23(b)(3) must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998) (internal quotation marks and citation omitted). Rule 23(b)(3) provides a non-exhaustive list of factors relevant to the superiority requirement, including: the class members' interest in individually controlling the prosecution of separate actions; the extent and nature of any

similar litigation already commenced by class members; the desirability of concentrating the litigation in a particular forum; and the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).

A class action is certainly the superior method for adjudicating the instant controversy. Generally, "[a]s a practical matter, investors defrauded by securities law violations have no recourse other than class relief." Shapiro v. Alliance MMA, Inc., No. 17-2583, 2018 WL 3158812, at *6 (D.N.J. June 28, 2018); see also Smith v. Suprema Specialties, Inc., No. 02-168, 2007 WL 1217980, at *10 (D.N.J. Apr. 23, 2007) ("[C]lass actions are favored in the securities litigation context because they are necessary to meaningfully enforce the securities laws.").  This is so here where Lead Plaintiff seeks to represent a large class of geographically dispersed securities purchasers "whose individual damages may well be small enough to render individual litigation prohibitively expensive." See In re Merck & Co., Inc. Vytrin/Zetia Sec. Litig., No. 08-2177, 2012 WL 4482041, at *8 (D.N.J. Sept. 25, 2012).  The Court is aware of other actions in this District raising similar securities fraud claims against Defendants, including the opt-out action pending before this Court, see Carmignac Gestion, S.A. v. Perrigo Co. PLC, No. 18-2291, 2019 WL 3451523 (D.N.J. July 31, 2019), but Defendants have not argued that those cases defeat the superiority requirement here.  Aside from those cases, the Court is not aware of any class member interest in prosecuting this matter on an individual basis.  Critically, given the voluminous class size, class adjudication in this forum is appropriate to ensure consistency in adjudication and to prevent the possibility of conflicting outcomes that may be rendered on individual claims. Accordingly, the Court finds that the class action is the most appropriate vehicle for adjudication, and the superiority requirement is met.

16

2.      **Predominance**

Class certification under Rule 23(b)(3) is appropriate only if the Court finds that common questions of law or fact predominate over questions exclusively affecting individual members. Fed. R. Civ. P. 23(b)(3).  "Rule 23 does not require the absence of all variations in a defendant's conduct or the elimination of all individual circumstances."  Reyes v. Netdeposit, LLC, 802 F.3d 469, 489 (3d Cir. 2015); see also Harnish v. Widener Univ. Sch. of Law, 833 F.3d 298, 304 (3d Cir. 2016) ("[I]f the court decides that the central, predominant issues in the case are common, then Rule 23(b)(3) is met despite the possibility that some subsidiary issues will require individualized evidence.").  Rather, the predominance inquiry turns on whether the evidence necessary to prove the essential elements of the underlying claims will vary from class member to class member, causing the Court to engage in individual treatment of the issues.  See Tyson Foods, Inc. v. Bouaphakeo, 136 S.Ct. 1036, 1045 (2016); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008).

Here, Lead Plaintiff alleges violations of Section 10(b) and Rule 10b-5 and Section 14(e) against all Defendants, and violations of Section 20(a) against the Individual Defendants.  The elements of a Section 14(e) violation are analogous to those of a Section 10(b) and Rule 10b-5 claim.  See In re Digital Island Sec. Litig., 357 F.3d 322, 328 (3d Cir. 2004); Carmignac Gestion, S.A., 2019 WL 3451523, at *8 (explaining that "the only difference" between Section 14(e)'s and Rule 10b-5's elements "is that Section 14(e) arises in connection with a tender offer, while [R]ule 10b-5 arises in connection with a purchase or sale of a security").  Likewise, as stated earlier, establishing a securities law violation is an essential prerequisite to finding Section 20(a) liability. See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284 (3d Cir. 2006) (explaining that Section 20(a) holds liable those who control a Section 10(b) violator).  For those reasons, the Court

17

analyzes the elements of a Rule 10b-5 violation to determine whether Lead Plaintiff has satisfied the predominance requirement.

To establish its Rule 10b-5 securities fraud claim, Lead Plaintiff must demonstrate: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." City of Edinburgh Council, 754 F.3d at 167. Lead Plaintiff may invoke the Basic presumption to establish reliance by showing "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." Halliburton II, 573 U.S. at 268. If Lead Plaintiff satisfies those requirements, Defendants may rebut the presumption by producing "enough evidence 'to withstand a motion for summary judgment or judgment as a matter of law on the issue.'" Bing Li, 324 F.R.D. at 344 (citation omitted).

Defendants contend that Lead Plaintiff cannot satisfy Rule 23(b)'s predominance requirement with respect to the issues of reliance and damages. Because Defendants' arguments concerning reliance are unique to each proposed class, the Court will first consider the viability of each in turn. The Court's primary inquiry is whether Lead Plaintiff is entitled to the Basic presumption of reliance[6] and, if so, whether Defendants successfully rebut that presumption. See Halliburton II, 573 U.S. at 268-69.

---

[6] In the alternative, Lead Plaintiff argues that it is entitled to the Affiliated Ute presumption of reliance for fact omissions. See Affiliated Ute Citizens of Utah v. U.S., 406 U.S. 128 (1972). Plaintiff's Memorandum of Law in Support of Motion for Class Certification ("Pls. Br."), ECF No. 163.1, at 23-25.

### a.    Reliance:  U.S. Purchaser Class

Lead Plaintiff bears the burden to establish that the Basic presumption applies.  Halliburton II, 573 U.S. at 276.  Before turning to Defendants rebuttal arguments, the Court must first determine whether Lead Plaintiff has shown:  (1) Perrigo's alleged misrepresentations were publicly known; (2) Perrigo's stock traded in a public market; and (3) Lead Plaintiff traded stock between the time the misrepresentations were made and the truth was revealed.[7]  See id. at 268. The Court is satisfied that those requirements are met here.

Lead Plaintiff alleges that Defendants' misrepresentations were publicly known through investor presentations, conference calls, letters, and other public statements during the Class Period.  See Am. Compl. ¶¶ 132-150, 176-204.  Lead Plaintiff also alleges, with evidentiary support, that U.S. Purchaser Class members purchased Perrigo stock during the Class Period.  See Pls. Br. at 17; ECF No. 6.4 (identifying purchases and sales).  Moreover, Lead Plaintiff has established that the New York Stock Exchange is an efficient market, and Perrigo shares traded on the NYSE during the Class Period.[8]  Having met these prerequisites, Lead Plaintiff has established that the Basic presumption applies to the U.S. Purchaser Class.

---

[7] Although the Basic presumption also requires a showing of materiality, at the class certification stage, Lead Plaintiff need not prove that element.  Halliburton II, 573 U.S. at 282 (explaining that "[e]ven though materiality is a prerequisite for invoking the Basic presumption . . . it should be left to the merits stage, because it does not bear on the predominance requirement of Rule 23(b)(3)"); accord Amgen, 568 U.S. at 474 ("Because a failure of proof on the issue of materiality, unlike the issues of market efficiency and publicity, does not give rise to any prospect of individual questions overwhelming common ones, materiality need not be proved prior to Rule 23(b)(3) class certification.").

[8] Determining market efficiency requires a five-factor analysis set forth in Cammer v. Bloom; the Court considers: (1) the stock's average trading volume; (2) coverage of a company's stock in securities analyst reports; (3) the reported number of market makers; (4) the company's eligibility to file an S-3 registration statement; and (5) stock price reaction to unexpected corporate events or financial releases.  See 611 F. Supp. 1264, 1286-97 (D.N.J. 1981).  Plaintiff submits Dr. Nye's expert report, which establishes that each of the Cammer factors weighs in favor of a finding of market efficiency.  See Nye Report ¶¶ 18-54.  Defendants do not challenge the reliability of Dr. Nye's report in this regard or the market efficiency concerning Perrigo stock on the NYSE.  Indeed, Third Circuit courts have consistently found that the NYSE is an efficient market for stock traded thereon.  See, e.g., Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000); In re Merck & Co. Inc. Sec., Derivative, & ERISA Litig., 2013 WL 396117, at *11; In re Schering-Plough Corp./ENHANCE Sec. Litig., No. 8-397, 2012 WL 4482032, at *5 (D.N.J. Sept. 25, 2012); In re DVI Inc. Sec. Litig., 249 F.R.D. at 208; In re Laidlaw Sec. Litig., No. 91-1829, 1992 WL 68341, at *10 n.8 (E.D. Pa. 1992).

The Court now considers Defendants' rebuttal arguments.  Defendants do not challenge the <u>Basic</u> presumption's application to the U.S. Purchaser Class.  Instead, Defendants attempt to rebut the presumption by arguing that Lead Plaintiff "relied on information other than the alleged misrepresentations by Perrigo in rejecting Mylan's tender offer," including "its own assessments of Mylan's lowball offer, Mylan's defective corporate governance, and integration risks."   Defs. Br. at 15.  Defendants claim that statements of two plaintiff members indicating that they considered factors other than Perrigo's misrepresentations in deciding whether to reject Mylan's tender offer is enough to rebut the <u>Basic</u> presumption.  Defs. Br. at 15 (citing deposition testimony indicating that those plaintiff members were concerned about Mylan's corporate governance, and such concerns weighed into their decision not to tender).  This cannot be the case.

First, accepting Defendants approach would defy logic; it is axiomatic that any decision-making process involves a consideration and weighing of various factors.  Although neither <u>Basic</u> nor <u>Halliburton II</u> define the precise level of outside reliance needed to "sever[ ] the link" between the misrepresentation and the plaintiff's "decision to trade at a fair market price," <u>Halliburton II</u>, 573 U.S. at 268-69 (quoting <u>Basic</u>, 485 U.S. at 248), reading those cases to ignore the realities of decision-making would lead to absurd results.  Defendants have not produced any evidence showing that plaintiff members—or any other U.S. Purchaser Class members—relied solely, or even substantially, on information about Mylan in deciding whether to tender.  Nor have Defendants produced any evidence showing that plaintiff members' concerns about Mylan's

---

Nothing in the record persuades the Court that it would make a contrary finding here.  The Court is satisfied that Lead Plaintiff has demonstrated market efficiency with respect to Perrigo shares traded on the NYSE.

corporate governance outweighed their reliance on the integrity of the market price for Perrigo shares.[9]

Second, even if Defendants' proffered evidence were enough to rebut the presumption of reliance for certain U.S. Purchaser Class members, it would not defeat predominance. See Halliburton II, 573 U.S. at 276 ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."). Aside from the cherry-picked statements of two individual class members, Defendants have presented no evidence indicating that the class would be overwhelmed with similar issues of individual reliance.

Finally, Defendants' proffer is misplaced with respect to the U.S. Purchaser Class. The U.S. Purchaser Class comprises "all persons who purchased Perrigo's publicly traded common stock" during the Class Period. Am. Compl. ¶ 273. Defendants have not offered any evidence indicating that U.S. Purchaser Class members relied on information other than Perrigo's misrepresentations in deciding whether to purchase Perrigo stock. Defendants' proffered evidence is perhaps better suited to rebut the Basic presumption for the Tender Offer Class, but it has no bearing on certification of the U.S. Purchaser Class.

Under any scenario, Defendants have failed to make "[a]ny showing that severs the link" between the misrepresentation and the price received or paid or the "decision to trade at a fair market price," and the Court concludes that the U.S. Purchaser Class is entitled to the Basic presumption of reliance. See Halliburton II, 573 U.S. at 268-69 (quoting Basic, 485 U.S. at 248).

---

[9] Defendants characterize plaintiff members' statements as affirmative evidence that they relied on their assessments about Mylan alone in deciding to reject Mylan's offer, but the testimony shows otherwise. See Defs. Br. at 15. Those plaintiff members testified to their concerns about Mylan's corporate governance, which weighed into their decision not to tender. They did not testify that they relied exclusively on those concerns to make that decision.

b.        **Reliance:  TASE Purchaser Class**

Defendants argue that Lead Plaintiff may not invoke the Basic presumption of reliance for the TASE Purchaser Class because Lead Plaintiff did not demonstrate that the TASE is an efficient market for Perrigo shares.  Defs. Br. 10.  The Court disagrees.

Because the parties dispute concerns market efficiency, the Court begins by analyzing the Cammer factors.  As stated earlier, the Cammer factors are: (1) the stock's average weekly trading volume; (2) coverage of a company's stock in securities analyst reports; (3) the reported number of market makers; (4) the company's eligibility to file an S-3 registration statement; and (5) stock price reaction to unexpected corporate events or financial releases.  See 711 F. Supp. at 1286-87.  These factors are not "meant to be . . . a rigid checklist."  McIntire v. China MediaExpress Holdings, Inc., 38 F. Supp. 3d 415, 432 (S.D.N.Y. 2014).   A plaintiff need only show that the stock traded in a "generally efficient market" at the class certification stage, see Halliburton, 573 U.S. at 279, a burden that is not "onerous," In re Petrobras Sec., 862 F.3d 250, 278 (2d Cir. 2017).

In support of its position that TASE is an efficient market, Lead Plaintiff proffers Dr. Nye's expert report, which examines the Cammer factors with respect to Perrigo's stock trading on the TASE.  See generally Nye Report ¶¶ 16-59.  Defendants challenge the reliability of Dr. Nye's TASE market analysis and provide their own expert, Dr. Gompers, to support their contention that TASE is not an efficient market.   See generally Expert Report of Paul A. Gompers ("Dr. Gompers") (Apr. 17, 2019) ("Gompers Report"), ECF No. 189.47.  The Court considers the parties' competing expert reports in its analysis and addresses each Cammer factor in turn.

1.   Cammer Factor 1:  Average Weekly Trading Volume

High weekly trading volume is evidence of market efficiency "because it implies significant investor interest in the company.  Such interest, in turn, implies a likelihood that many

investors are executing trades on the basis of newly available or disseminated corporate information." <u>Cammer</u>, 711 F. Supp. at 1286; <u>Unger v. Amedisys Inc.</u>, 401 F.3d 316, 324 (5th Cir. 2005) ("A high weekly stock trading volume suggests the presence of active, informed investors."). <u>Cammer</u> did not create a bright-line rule for adequate trading volume but presumed that a trading volume of two percent or more justifies a strong presumption of market efficiency. <u>See id.</u> (citing Bromberg & Lowenfels, 4 <u>Securities Fraud and Commodities Fraud</u> § 8.6 (Aug. 1988)).

Here, Dr. Nye concluded that Perrigo's average weekly trading volume across both the TASE and the United States was 7.0% of outstanding shares during the Class Period. <u>See</u> Nye Report ¶ 20; ECF No. 199.5, Expert Rebuttal Report of Zachary Nye, Ph.D. (Jun. 5, 2019) ("Nye Rebuttal Report") ¶ 19. Defendants expert, Dr. Gompers, criticizes Dr. Nye's analysis for not calculating an average weekly trading volume for the TASE separately from the United States market. Gompers Report ¶ 29. According to Dr. Gompers, had Dr. Nye performed an individual analysis, "he would have found that his measure of average weekly turnover" for the TASE "is only .40%." <u>Id.</u> To calculate that percentage, Dr. Gompers compared Dr. Nye's average weekly trading volume for United States markets—6.6%, <u>see</u> Nye Report ¶ 20—with the 7.0% representing the combined trading volume for the United States and TASE markets. Gompers Report ¶ 29 n.62.

In rebuttal, Dr. Nye asserts that Dr. Gompers's .40% finding is incorrect because "the denominator in [Dr. Gompers's] analysis is Perrigo's total shares outstanding, which includes shares traded in both the U.S. and the TASE." Nye Rebuttal Report ¶ 21. Regardless, Dr. Nye maintains that calculating the TASE's average weekly trading volume for Perrigo shares in isolation from the United States markets is unnecessary to determine efficiency because "'[w]here

securities are traded in more than one market (e.g., on a major stock exchange and on a regional exchange or over the counter), the focus should be on the primary market for the security since the secondary market is likely to move in close parallel to the primary market.'" Id. ¶¶ 21-22 (quoting Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud § 8.6)). According to Dr. Nye, applying that "close-parallel" principle leads to the conclusion that "each of the venues on which Perrigo stock traded, including the TASE" is efficient. Id. ¶ 22.

The Court attaches some weight to the preceding passage from Professors Bromberg's and Lowenfels's well-regarded securities fraud treatise on which Dr. Nye relied in concluding that an isolated average weekly trading volume analysis for the TASE need not be performed.[10] However, Dr. Nye's conclusory statement that the close-parallel principle applies to the TASE provides no explanation as to why other than that it states a secondary market is likely to move in close parallel to a primary market. More fundamentally, Dr. Nye refers to the close-parallel principle as the "prevailing methodology" for determining average weekly trading volume of markets like the TASE but references only Professors Bromberg's and Lowenfels's treatise as support for his proposition. As applied here, the close-parallel principle is too speculative to support the first Cammer factor.

The Court sees no impediment to Dr. Nye's ability to perform an individual analysis of the average weekly trading volume of Perrigo shares on the TASE; indeed, he performed a combined weekly analysis of both the TASE and the NYSE. Alternatively, Dr. Nye could have more fully explained the close-parallel principle to persuade the Court that it should apply here. Without having the benefit of either analysis, the Court cannot conclude that the average weekly trading

---

[10] The Cammer court similarly relied on Professors Bromberg's and Lowenfels's treatise, and, specifically, the section referenced by Dr. Nye, in surmising that a two-percent average weekly trading volume or higher justifies a strong presumption of market efficiency. See Cammer, 711 F. Supp. at 1286.

volume of shares on the TASE presumes market efficiency.  The first <u>Cammer</u> factor thus weighs against finding an efficient market.

2.    <u>Cammer Factor 2:  Analyst Coverage</u>

Significant securities analyst coverage of a company's stock is "persuasive" evidence of market efficiency.  <u>See</u> <u>Cammer</u>, 711 F. Supp. 1286.  Lead Plaintiff identified over thirty investment firms that issued "over 600 analyst reports" covering Perrigo's stock during the Class Period.  Pls. Br. at 19; <u>see also</u> Nye Report ¶ 24 (listing several of those investment firms).  Dr. Nye also points to a variety of other sources that disseminated information about Perrigo stocks to the investing public, including media coverage, public filings, trade magazines, and international news.  <u>Id.</u> ¶¶ 25-26.  According to Dr. Nye, information from those reports and other sources was "widely disseminated to investors in both the U.S. market and the Israeli market."  <u>Id.</u> ¶ 27.

Defendants challenge Dr. Nye's findings, claiming that analyst coverage for Perrigo shares occurred "primarily in the United States."  Defs. Br. at 12.  Dr. Gompers determined that "three contributors which distributed only seven reports from Israel during the Class Period" covered Perrigo stock compared to the "26 U.S.-based contributors that issued a total of 507 reports during that same period."  Gompers Report ¶ 31.  For that reason, Dr. Gompers concluded that Dr. Nye failed to establish that TASE market participants engaged in the production and distribution of information about Perrigo stock in Israel, where the TASE is located.  <u>Id.</u>

In rebuttal, Dr. Nye highlights Dr. Gompers's confirming finding that significant coverage of Perrigo stock occurred during the Class Period.  Nye Rebuttal Report ¶ 23.  Concerning Israel, Dr. Nye criticizes Dr. Gompers for using a "country-stratification approach" and emphasizes the accessibility of analyst coverage to investors across international markets.  <u>See</u> <u>id.</u> ¶¶ 23-27 (arguing, among other things, that "[a]nalysts outside of Israel disseminated information on the

25

firm itself, not information relevant exclusively to U.S. investors" and "an efficient market for a particular stock is one in which prices reflect all public information, not only information disseminated from within the national borders where a particular exchange is located").

    The Court finds unpersuasive Dr. Gompers's suggestion that analyst coverage must occur in a particular country to find an efficient market.  Dr. Gompers's approach improperly limits courts from considering widely-disseminated and accessible information otherwise relevant to the efficient-market analysis.  Neither Cammer nor other cases interpreting this factor support such a restrictive approach.  See Cammer, 711 F. Supp. at 1286.  Courts instead assess the total number of securities analysts covering a security because "the greater the number of securities analysts following and reporting on a company's stock, the greater the likelihood that information released by a company is being relied upon by investors." In re Xcelera.com Sec. Litig., 430 F.3d 503, 514 (1st Cir. 2005); see also Wilkof v. Caraco Pharmal. Labs., Ltd., 280 F.R.D. 332, 344 (E.D. Mich. 2012) ("Cammer emphasized that coverage by analysts of a company increases the availability of information about a company's stock, thus increasing the likelihood that investors rely on said information, indicating an efficient market.").  Defendants have not produced any evidence showing that TASE investors lacked accessibility to analyst coverage and other pertinent Perrigo information disseminated outside of Israel.  The Court thus attributes weigh to the significant analyst coverage and other sources of disseminated information concerning Perrigo stock during the Class Period identified by Lead Plaintiff, even accepting that most of that coverage was distributed from the United States.  See Gompers Report, Ex. 3.  The second factor therefore weighs in favor of finding market efficiency.

### 3.    Cammer Factor 3:  Market Makers

"'A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations . . . and who stands ready to buy or sell these publicly quoted prices.'"  Hull v. Glob. Digital Sols., Inc., No. 16-5153, 2018 WL 4380999, at *8 (D.N.J. Sept. 14, 2019) (quoting In re Countrywide Fin. Corp. Sec. Litig., 273 F.R.D. 586, 613-14 (C.D. Cal. 2009)).  Market makers "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."  Cammer, 711 F. Supp. at 1287.  A higher number of market makers for a given security suggests that the security is liquid, and therefore, that the market for the security is efficient.  Hull, 2018 WL 4380999, at *8.

Dr. Nye opines that there were at least seventeen market makers for Perrigo stock on the TASE during the Class Period.  Nye Rebuttal Report ¶ 29.  Under Cammer, this number is sufficient to justify "a substantial presumption that the market for the security is an efficient one."  See 711 F. Supp. at 1283 (quoting Bromberg at § 8.6); see also In re Initial Pub. Offering Sec. Litig., 290 F.R.D. 81, 100 (S.D.N.Y. 2009) (fourteen market makers indicates market efficiency).  The third factor thus weighs in favor of finding market efficiency.[11]

### 4.    Cammer Factor 4:  S-3 Registration Statement

The fourth Cammer factor addresses whether Perrigo "was entitled to file an S-3 Registration Statement in connection with public offerings."  711 F. Supp. at 1287.  "Corporations permitted to use the S-3 form are . . . presumed to be actively traded and widely followed," so a company's ability to file an S-3 registration statement evidences an efficient market.  Krogman v.

---

[11] Dr. Gompers correctly observed that Dr. Nye's original expert report did not indicate the number of market makers for Perrigo stock on the TASE during the Class Period.  See Gompers Report ¶ 32.  Dr. Nye corrected that oversight in his Rebuttal Report.  See Nye Rebuttal Report ¶ 29.  Because of this correction, which indicates a sufficient number of market makers for Perrigo stock on the TASE during the Class Period to presume market efficiency, see Cammer, 711 F. Supp. at 1283, the Court does not address the parties' dispute regarding arbitrage activity.

Sterritt, 202 F.R.D. 467, 476 (N.D. Tex. 2001).  Here, Perrigo filed an S-3 registration statement with the SEC shortly before the Class Period.  Nye Report ¶ 43.  Even though Dr. Gompers opined that Dr. Nye's expert report did not satisfy the fourth Cammer factor, neither Dr. Gompers nor Defendants offer any arguments or evidence indicating that Perrigo was ineligible to file a Form S-3 during the Class Period.  See generally Gompers Report.  This factor thus weighs in favor of finding market efficiency.

> 5.    Cammer Factor 5:  Cause-and-Effect Relationship Between Stock Price and Unexpected Corporate Events or Financial Releases

Under the fifth Cammer factor, the Court assess whether there is empirical evidence of changes in Perrigo's stock price in response to unexpected corporate information.  Cammer, 711 F. Supp. at 1287.  This factor is "normally the most important factor in an efficiency analysis," In re DVI, Inc. Sec. Litig., 639 F.3d at 634, but it alone is not dispositive, West Palm Beach Police Pension Fund v. DFC Glob. Corp., No. 13-6731, 2016 WL 4138613, at *12 (E.D. Pa. Aug. 4, 2016) (collecting cases); Cammer, 711 F. Supp. at 1287 (explaining that establishing a cause-and-effect relationship is merely "helpful to a plaintiff seeking to allege an efficient market" (emphasis added)).

Experts often perform event studies to prove the causal relationship between a company's stock price and the release of new corporate information.  In analyzing the results of an event study, "[a] large abnormal stock price movement occurring at the same time the market receives news about an event suggests that the event caused the abnormal price movement."  Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 310 F.R.D. 69, 80 (S.D.N.Y. 2015) (internal quotation marks and citation omitted).  If the expert observes abnormal stock price movement, they next test for "statistical significance to see whether the result is unusual or unlikely to be

explained by the normal random variations of the stock price." Id. (internal quotation marks and citation omitted).

Here, Dr. Nye conducted an event study on daily stock prices during the Class Period and selected twelve dates on which Perrigo made earnings-related announcements. Nye Report ¶¶ 46, 47; id. Ex. 12. Dr. Nye observed that Perrigo stock reacted to news in a statistically significant manner on nine of the dates he examined, and that those days that showed statistically insignificant returns correlated to generally expected reported Perrigo financial information. Id. ¶ 48-49. He observed the same results for the TASE except for a single day the TASE was closed due to a holiday. See id. Ex. 12. Dr. Nye also noted the price parity between the United States and Israeli markets, opining that during the hours those markets were simultaneously open, Perrigo's stock price was the same throughout the Class Period "on a currency-adjusted basis." Id. ¶ 57. He concluded, based on those observations, that a causal relationship between Perrigo's disclosure of information to the market and the stock price existed during the Class Period.

Defendants highlight the alleged shortfalls of Dr. Nye's study. In particular, Defendants focus on Dr. Nye's failure to account for changes in Perrigo's stock price during the hours the TASE was open—but the United States market was not—after Perrigo's earnings announcements. Defs. Br. at 12-14. Dr. Gompers opines that the price of Perrigo shares on the TASE fully responded to those announcements only after the United States market had opened. Gompers Report ¶¶ 40-43 (using two of Dr. Nye's selected and examined dates to provide examples). He reached the same conclusion concerning Perrigo's corrective disclosures. See id. ¶¶ 44-46. According to Defendants, those observations indicate that Perrigo shares traded on the TASE did not "independently incorporate" Perrigo-specific news. Defs. Br. at 13.

29

The Court is not persuaded by Defendants' suggestion that Dr. Nye's failure to account for the change in Perrigo stock prices on the TASE during the time the United States market was closed evidences an inefficient market. See Defs. Br. at 11. First, both experts agree that Perrigo shares on the TASE were fully realized shortly after the release of new Perrigo information. See Gompers Report ¶¶ 40-43. Dr. Gompers merely criticizes Dr. Nye's disregard for fluctuations in Perrigo stock on the TASE before the United States market opened. But this oversight is immaterial because "[t]here is no consensus as to how quickly share prices must change to justify a finding of efficiency." Strougo v. Barclays PLC, 312 F.R.D. 307, 317 (S.D.N.Y. 2016). That both experts found a change in Perrigo share prices in reaction to new Perrigo information indicates that the TASE operated efficiently for Perrigo stock, regardless of whether those changes were fully realized shortly after the United States market opened.

Second, deficiencies in an event study are not determinative of whether a market is efficient. "Numerous courts have found market efficiency in the absence of an event study or where the event study was not definitive." Strougo, 312 F.R.D. at 321; see also Carpenters Pension Tr. Fund, 310 F.R.D. at 86. The Court is required to balance all five Cammer factors to determine market efficiency. The lack of a cause-and-effect relationship between the stock price and unexpected corporate information, compounded with other factors weighing heavily against market efficiency, may indicate an inefficient market. But the former deficiency alone is not dispositive. For those reasons, an event study's failure to show immediate impoundment of publicly available information into stock prices, without more, is not enough to defeat market efficiency. Even if the Court found that Dr. Nye's event study did not satisfactorily prove a cause-and-effect relationship, that failure alone would not outweigh other factors pointing to market efficiency.

Having considered the evidence and arguments submitted by both parties, the Court finds that the majority of the Cammer factors—two through five—tip the balance in favor of finding market efficiency.  The Court thus concludes that the TASE Purchaser Class is entitled to the Basic presumption of reliance.[12]

### c.    Reliance:  The Tender Offer Class

Defendants next attempt to rebut presumed reliance for "the approximately 40% of Perrigo shareholders who rejected Perrigo's recommendations and tendered their shares in response to Mylan's offer."[13]  Defs. Br. at 18.  According to Defendants, the decision to tender over Perrigo's recommendations evidences non-reliance, and, therefore, individual issues of reliance for those shareholders will predominate over common class questions.  See id. at 18-19.  The Court disagrees.

Section 14(e) makes it unlawful for any person to:

> make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

15 U.S.C. § 78n(e).

---

[12] To rebut the Basic presumption, Defendants make the same arguments as they did for the U.S. Purchaser Class.  See Defs. Br. at 14-15.  For the reasons stated in Section III.B.2(a), the Court finds that those arguments do not overcome the presumption of reliance for the TASE Purchaser Class.

[13] Defendants do not challenge whether a presumption of reliance applies to the Tender Offer Class.  Because Section 14(e)'s and Section 10(b)'s elements overlap and assessing Mylan's tender offer naturally involves the market price of Perrigo stock, the Court finds that applying the Basic presumption of reliance is appropriate.  See Roofers' Pension Fund v. Papa, No. 16-2805, 2017 WL 1536222, at *5 (D.N.J. Apr. 27, 2017); see also Lewis v. McGraw, 619 F.2d 192, 195 (2d Cir. 1980) (explaining that reliance is presumed "where it is logical to do so").  Because the Tender Offer Class does not relate to any one market for Perrigo stock, the Court relies on its analyses of the markets relevant to the U.S. and TASE Purchaser Classes to find that Lead Plaintiff met its burden.

Courts do not categorically exclude class members from bringing a Section 14(e) private cause of action merely based on their status as tendering or non-tendering shareholders.  See Schreiber v. Burlington N. Inc., 731 F.2d 163, 165-66 (3d Cir. 1984) (observing that that Section 14(e) "was enacted principally as a disclosure statute" meant to "insure that fully-informed investors [may] intelligently decide how to respond to a tender offer" (emphasis added)), aff'd 472 U.S. 1 (1985); Panter v. Marshall Field & Co., 646 F.2d 271, 283 (7th Cir. 1981) (explaining that Section 14(e) "is modeled after SEC rule 10b-5, and is designed to insure that shareholders confronted with a tender offer have adequate and accurate information on which to base the decision whether or not to tender their shares" (emphasis added)); Smallwood v. Pearl Brewing Co., 489 F.2d 579, 596 (5th Cir. 1974) ("[U]nder Section 14(e) a plaintiff may gain standing if he has been injured by fraudulent activities of others perpetrated in connection with a tender offer, whether or not he has tendered his shares." (emphasis added)); Plaine v. McCabe, 797 F.2d 713, 718 (9th Cir. 1986) (same).   Thus, under Section 14(e), entitlement to the Basic presumption is the same as any other case and hinges on whether the plaintiff met their burden of showing such entitlement, and, if so, whether the defendant has rebutted the presumption by producing "enough evidence 'to withstand a motion for summary judgment or judgment as a matter of law on the issue.'"  Bing Li, 324 F.R.D. at 344 (citation omitted).

Here, Defendants present no evidence indicating that tendering shareholders did not rely on Perrigo's alleged misrepresentations in deciding whether to accept Mylan's tender offer.  Defendants' claim that the act of tendering itself evidences non-reliance is neither supported by controlling law nor enough to sustain their burden.   First, the cases Defendants cite as support for their position are unpersuasive because those cases involved shareholders who actually knew misrepresentations were made in connection with a tender offer before deciding whether to tender.

See Spivak v. Petro-Lewis Corp., 120 F.R.D. 693, 698 (D. Colo. 1987); Hundahl v. United Ben. Life Ins. Co., 465 F. Supp. 1349, 1353-54 (N.D. Tex. 1979).  Defendants do not contend that plaintiff class members had similar knowledge about Perrigo's alleged misrepresentations.

Second, Defendants ignore the array of cases establishing that the inquiry under Section 14(e) is not focused on the shareholder's ultimate decision in response to a tender offer, but rather whether the shareholder had a fair opportunity to make that decision based on the information and disclosures available.  See, e.g., Schreiber, 731 F.2d at 166; Panter, 646 F.2d at 283.  A finding that tendering is per se evidence of non-reliance would essentially foreclose other securities litigants who may have relied on misrepresentations, but nonetheless accepted a tender offer, from bringing a private cause of action under Section 14(e).  That is especially so here where Defendants have not produced any other evidence showing that Perrigo's tendering shareholders did not rely on the Company's alleged misstatements.  Simply put, that a shareholder tenders shares over a company's recommendations is not categorical proof that they did not rely on that company's disclosures in making their decision.  The Court thus declines to find that the act of tendering alone rebuts the presumption of reliance.  For those reasons, Defendants have failed to meet their burden, and the Court concludes that the Tender Offer Class is entitled to a presumption of reliance.

### d.    Damages:  All Classes

Before concluding whether Lead Plaintiff has satisfied the predominance requirement, the Court turns next to Defendants' argument that Lead Plaintiff has failed to demonstrate that damages are capable of measurement on a class-wide basis.  Relying on the Supreme Court's decision in Comcast Corp. v. Behrend, 569 U.S. 27 (2013), Defendants claim that Lead Plaintiff failed to propose a class-wide damages methodology satisfying the predominance requirement for any proposed class.  Defs. Br at 20-29.  The Court disagrees.

The Court summarizes Dr. Nye's proposed class-wide damage methodologies for the proposed classes as follows:

- <u>U.S. and TASE Purchaser Classes</u>: Dr. Nye proposes a "price inflation" model to measure class-wide damages, which would analyze the market price for Perrigo stock on the days when the alleged material misrepresentations were reflected in the market and "the change in a security's price caused by a corrective disclosure and/or the materialization of a concealed risk." <u>See</u> Nye Report ¶ 63. According to Dr. Nye, one could conduct an event study applicable to all class members using this method to determine price inflation on each day during the Class Period, and once calculated, variations for damages on an individual basis based on trading activity could be determined. <u>See id.</u> ¶¶ 63-64. Dr. Nye offers distinct calculations to account for variations among class members. <u>Id.</u> at 64-65. Assuming that "the standards for Israeli law . . . [are] identical to that under U.S. law," Dr. Nye concludes that this proposed methodology could be used to calculate damages for both the U.S. Purchaser and TASE Classes. <u>Id.</u> ¶ 65.

- <u>Tender Offer Class</u>: Dr. Nye proposes a per-share model to measure class-wide damages, which would calculate "the difference between the price for which shares were tendered (or not tendered) and the 'genuine' value of those shares." <u>Id.</u> ¶ 68 (citation omitted). Dr. Nye then calculates the per-share damages amount using the value of Mylan shares "[i]mmediately prior to the expiration of the tender offer" and the "genuine" value of Perrigo's shares "immediately following the expiration of the tender offer." <u>Id.</u> ¶ 69. According to Dr. Nye, though the total per-share damages he calculated may change depending on the trier of fact's findings, the per-share equation used to calculate that amount will remain constant. <u>See id.</u> ¶ 70.

At this stage, the Court finds that Dr. Nye's proposed methodologies are sufficient to satisfy the Rule 23(b)(3)'s predominance requirement. First, the Third Circuit has explicitly cautioned that <u>Comcast</u>'s damages "predominance analysis was specific to the antitrust claim at issue"—a finding "consistent with decisions by several of our sister courts." <u>Neale v. Volvo Cars of North Am., LLC</u>, 794 F.3d 353, 374 (3d Cir. 2015) (collecting cases). Second, even if <u>Comcast</u> applies here, Defendants' contention that Dr. Nye's damage models are inconsistent with Lead Plaintiff's theories of liability fails. In <u>Comcast</u>, the Court stated that a class action damages model "must measure only those damages attributable to [the plaintiff's] theory." 569 U.S. at 35. Here, Lead Plaintiff asserts two theories of liability corresponding to two models of damages: (1) that Defendants made material misrepresentations that artificially inflated Perrigo's stock price, and

34

class members detrimentally relied on those misrepresentations in purchasing Perrigo stock at an inflated price (U.S. Purchaser and TASE Classes), see Am. Compl. ¶¶ 282-90; and (2) such representations prevented class members from "fairly assessing" Mylan's tender offer and deprived them "of the opportunity to exchange their Perrigo shares for superior compensation in cash and stock" (Tender Offer Class), id. ¶¶ 295-301. Thus, unlike Comcast, there is no concern that Dr. Nye's damages models "failed to measure damages resulting from the particular . . . injury on which [the plaintiffs'] liability in this action is premised." See 569 U.S. at 36.

Third, Defendants' criticisms about Dr. Nye's methodologies are largely focused on Dr. Nye's failure to make precise damage calculations,[14] which are not required for class certification. See Comcast, 569 U.S. at 35 (stating that "[c]alculations need not be exact"); Reyes, 802 F.3d at 485, 489 (noting that "an inability to calculate damages on a classwide basis will not, on its own, bar certification"); Neale, 794 F.3d at 374-75; City of Sterling Heights, 2015 WL 5097883, at *13 (explaining that Comcast "did not stand for the general proposition that in all class actions, a plaintiff must prove that damages are calculable on a class-wide basis before certification can be granted"); Waggoner v. Barclays PLC, 875 F.3d 79, 106 (2d Cir. 2017) (finding that the lead plaintiff's failure to "account for variations in inflation over time" is inconsequential at the class certification stage). Nor is it dispositive that individualized issues may affect damages calculations so long as common issues determining liability predominate. See Neale, 794 F.3d at 374-75; In re Wilmington Tr. Sec. Litig., 310 F.R.D. 243, 246 (D. Del. 2015) ("[C]lass certification is not

---

[14] With respect to the Tender Offer Class, Defendants contend that Dr. Nye's proposed per-share damages model "is not based on any widely accepted methodology," "overstates damages to proposed class members," and "fails to acknowledge . . . complexities" concerning "any 'but for' scenarios, causing '[d]amages calculations [to be] predicated on . . . individualized inquiries.'" Defs. Br. at 21. Defendants also challenge Dr. Nye's price-inflation model for the U.S. and TASE Purchaser Classes, arguing that Lead Plaintiff failed to articulate "any specific approach for managing damages arising from Section 10(b)," and the model, among other things, fails to describe how price inflation will be calculated for each alleged misrepresentation, see id. 25-27, some of which the Court already dismissed in its July 27, 2018 Opinion and Order, ECF Nos. 136-37.

defeated when there are individual issues with respect to the calculation of damages."); West Palm Beach Police Pension Fund, 2016 WL 4138613, at *14-15.

For those reasons, that Dr. Nye did not address certain hypotheticals offered by Defendants, see Defs. Br. at 21-23, and did not actually calculate the amount of damages for each class is inconsequential at this juncture. The Court is not required to "assess the validity of Plaintiff's damages model[s]" to determine whether class certification is warranted. See City of Sterling Heights, 2015 WL 5097883, at *13. It is enough for Lead Plaintiff to show that each of Dr. Nye's proposed methodologies can be used to prove damages on a class-wide basis, which it has done. The Court thus finds that the predominance requirement is met with respect to measuring damages for each proposed class

Having considered the parties' arguments and submissions concerning reliance and damages, the Court is satisfied that the predominance requirement is met for each proposed class. Lead Plaintiff has thus satisfied the class certification requirements of Rule 23(a) and (b).[15]

### C.    Class Period

As a final matter, the Court considers Defendants' argument that the Class Period's commencement date should be modified. Defendants maintain that April 21, 2015 is not an appropriate commencement date because, despite Mylan's characterization of the proposal to acquire Perrigo during that time, it could not make a formal tender offer until it received approval from its shareholders. Defs. Br. at 38. Defendants thus claim that the Class Period should "not commence until September 14, 2015," a date after Mylan received that approval and made its formal offer. Id.   The Court declines to modify the Class Period.

---

[15] Because the Court finds that the proposed classes are entitled to the Basic presumption of reliance, it does not address Lead Plaintiff's alternative argument that the Affiliated Ute presumption applies.

Class action plaintiffs are "entitled to define the class period as broadly as their evidence supports." In re Neurontin Antitrust Litig., No. 02-1390, 2011 WL 286118, at *1 n.4 (D.N.J. Jan. 25, 2011) (citation omitted). At the class certification stage, courts must not inquire into the merits to determine the adequacy of a class period. See Lerch v. Citizens First Bancorp, Inc., 144 F.R.D. 247, 252-53 (D.N.J. 1992). Instead, courts need only "look [to] the pleadings to determine whether there [is] sufficient evidence to support an allegation that formed the basis for a class period start date." See Wilson v. LSB Indus., Inc., No. 15-7617, 2018 WL 3913115, at *19 (S.D.N.Y. Aug. 13, 2018). Here, the Class Period's commencement date of April 21, 2015 reflects the date on which Lead Plaintiff alleges Perrigo made its first actionable misrepresentation. ECF No. 199, Plaintiff's Reply Memorandum of Law in Support of Motion for Class Certification at 29; Am. Compl. ¶¶ 96-97, 133. Based on the Amended Complaint, Lead Plaintiff's proposed Class Period start date is justified. Should Defendants wish to challenge the Class Period after uncovering evidence that contradicts that date, they may do so either on a motion for summary judgment or at trial.

## III.    CONCLUSION

For the reasons set forth herein, Lead Plaintiff's Motion to Certify Class is **GRANTED** with respect to each proposed class. An appropriate order will follow.

Dated:  November 14, 2019

                        _/s Madeline Cox Arleo_____
                        **Hon. Madeline Cox Arleo**
                        **UNITED STATES DISTRICT JUDGE**