**[Docket Nos. 342, 344 and 346]**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | | |
|---|---|---|
| _____ | : | |
| ROOFER'S PENSION FUND, et al., | : | |
| | : | |
| Plaintiffs, | : | Civil No. 16-2805 (RMB/LDW) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| JOSEPH C. PAPA, et al., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**APPEARANCES:**

LOWENSTEIN SANDLER, LLP
By: Michael B. Himmel & Michael T.G. Long
One Lowenstein Drive
Roseland, New Jersey 07068

*Counsel for the Lead Plaintiffs*

POMERANTZ, LLP
By:  Joshua B. Silverman (*pro hac vice*), Omar Jafri (*pro hac vice*)
     Jeremy A. Lieberman (*pro hac vice*), & Thomas Przybylowski (*pro hac vice*)
10 South LaSalle Street
Suite 3505
Chicago, Illinois 60603

*Counsel for the Lead Plaintiffs*

BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
By:  Gerald H. Silk (*pro hac vice*), James A. Harrod (*pro hac vice*), &
     Jesse L. Jensen (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020

*Counsel for the Lead Plaintiff*
GREENBAUM ROWE SMITH & DAVIS

By:  Alan S. Naar
99 Wood Avenue South
Iselin, New Jersey 07095

*Counsel for Perrigo Company PLC*

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
By:  James D. Wareham (*pro hac vice*), James E. Anklam (*pro hac vice*),
     Katherine L. St. Romain, Samuel P. Groner (*pro hac vice*),
     Samuel M. Light (*pro hac vice*), & Jason Kanterman
801 17th Street, NW
Washington, DC 20006

*Counsel for Perrigo Company PLC*

GIBSON, DUNN & CRUTCHER LLP
By:  Marshall R. King, Reed Brodsky (*pro hac vice*), &
     David F. Crowley-Buck (*pro hac vice*)
200 Park Avenue
New York, New York 10166

*Counsel for Joseph C. Papa*

SULLIVAN & CROMWELL LLP
By:  John L. Hardiman (*pro hac vice*), Brian T. Frawley, &
     Michael P. Devlin (*pro hac vice*)
125 Broad Street
New York, New York 10004

*Counsel for Judy Brown*

**RENÉE MARIE BUMB, Chief United States District Judge:**

Securities fraud cases, like the one here, often turn on who said what, what they said,

when they said it, and what they knew when they spoke.  This securities fraud class action

targets statements made by Defendant Perrigo Company PLC (Perrigo), Perrigo's former

Chief Executive Officer, Joseph C. Papa (Papa), and Perrigo's former Chief Financial Officer,

Judy Brown (Brown), about Perrigo's generic drug pricing and its integration with a European

pharmaceutical company, Omega Pharma N.V. (Omega).  Plaintiffs here, institutional

2

investors, insurance companies, and pension funds, who owned stock in Perrigo when Defendants made the challenged statements, contend those statements violated federal securities laws because the statements were false and misleading, causing Perrigo's stock price to plummet when the market learned the truth about generic drug pricing and the Omega integration.

Defendants have all moved for summary judgment, arguing, among other things, that Plaintiffs have not shown those statements were false or that Defendants acted with scienter—critical requirements to maintain a private cause action for securities fraud. Perrigo also moves to exclude Plaintiffs' experts claiming they either are unqualified to render expert testimony or their opinions are unreliable. Plaintiffs oppose those motions, arguing material facts are disputed requiring a jury to resolve, especially on Defendants' scienter. They also contend their experts should not be excluded.

The record before this Court on the motions is voluminous, consisting of hundreds of pages of briefing, multiple declarations, statements of facts (in the hundreds of pages) with thousands of pages of exhibits. The Court also heard oral argument on the motions for several hours.[1]

Having extensively reviewed the record, this Court **GRANTS** Brown's summary judgment motion [Docket No. 344], **GRANTS, in part, and DENIES, in part,** Papa's summary judgment motion [Docket No. 346], **RESERVES, in part, and DENIES, in part**, Perrigo's summary judgment motion [Docket No. 342], and **RESERVES** on Perrigo's motion

---

[1] The Honorable Julien Xavier Neals, U.S.D.J., heard oral argument on the motions in April 2022. [Docket No. 385.] The Court has reviewed the transcript of that proceeding.

to exclude Plaintiffs' experts until the Court holds *Daubert* hearings on each expert.

## I.  BACKGROUND

The parties are all too familiar with the facts, and the Court recites only those facts necessary to address the pending motions.  The Court mainly writes for the parties.

When Plaintiffs sued, they brought four theories for their securities fraud claims.  [Am. Compl. ¶ 1 (Docket No. 89).]   According to Plaintiffs, Defendants made material misrepresentations and omissions to overvalue Perrigo to fight off a potential takeover from Mylan, N.V. (Mylan) which made a tender offer to buy Perrigo stock from its shareholders. [*Id.*]  Plaintiffs claim Defendants committed securities fraud by mispresenting:  (1) Perrigo's largest financial asset, a royalty stream for the drug Tysabri (Tysabri Claim); (2) Perrigo's organic growth (Organic Growth Claim); (3) generic drug pricing (Generic Rx Claim)—that is, Defendants hid from its shareholders its collusive pricing with other competitors and the competitive environment for generic drugs; and (4) Perrigo's integration success with Omega (Omega Integration Claim).  Defendants (and other named defendants) moved to dismiss Plaintiffs' entire lawsuit arguing mainly that Plaintiffs' Complaint failed to establish that Defendant made material misrepresentations and acted with scienter.  *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *6 (D.N.J. July 27, 2018).

The Court dismissed the Tysabri and Organic Growth Claims, but not the Generic Rx and Omega Integration Claims, thus, significantly narrowing Plaintiffs' lawsuit.  *Id.* at *1, *24.  The Court dismissed the Tysabri Claim because:  (1) Plaintiffs failed to plead facts showing Defendants made material misrepresentations for one component of the claim (GAAP violations for Tysabri's royalty stream) and Defendants acted with scienter for the

other component (Defendants' statements about Tysabri's value). *Id.* at *9-10, *18-21. The Court also dismissed the Organic Growth Claim because Plaintiffs failed to plead specific facts establishing scienter for the challenged statements about Perrigo's organic growth. *Id.* at *22. But the Court declined to dismiss the Generic Rx and Omega Integration Claims. *Id.* at *10-12, *13-15, *21-22, *23-24

As to the Generic Rx Claim, the Court found the Amended Complaint alleged sufficient facts that Defendants materially misrepresented generic drug pricing. *Id.* at *10-12. The Court found the allegations as to Papa's statements about keeping pricing "flat to up slightly" despite price hikes of 300%-500% for certain drugs to be affirmatively misleading to withstand a motion to dismiss. *Id.* at *12. The Court also found the Amended Complaint's allegations supported a finding of scienter. *Id.* at *21-22. The Court looked to the allegations on Papa's and Brown's responses to analysts' questions about pricing in Perrigo's generic division. *Id.* at *21. And the Court found the size of the collusive scheme supported an inference of scienter. *Id.*

Turning to the Omega Integration Claim, the Court found Plaintiffs alleged enough facts to show that Defendants made material misrepresentations as to the present success of Perrigo's integration of Omega. *Id.* at *14. The Court limited the Omega Integration Claim to statements about "the present success of the integration." *Id.* at *14. The Court dismissed statements by former defendant Marc Coucke (Coucke)—Omega's co-founder and former Chairman and Chief Executive Officer—about Omega, and Defendants' statements on "purely forward-looking revenue and synergy projections." *Id.* at *14. The Court also found Plaintiffs alleged enough facts establishing scienter for Defendants' statements about the

5

Omega integration. *Id.* at \*23. Looking to Papa's and Brown's statements, the Court noted their statements implied first-hand knowledge of the integration, which supported an inference of scienter. *Id.* Coupled with those statements, the Court also found Plaintiffs' allegations about Omega's management's resistance to the integration and other impediments to the integration supported a finding of scienter. *Id.* at \*23-24. The Court, however, did not credit the Amended Complaint's "allegations regarding underperformance in individual markets because [Plaintiffs] fail[ed] to allege any specific misrepresentations in connection with underperformance and fail[ed] to quantify the importance of these markets in any meaningful way." *Id.* at 23 n.23.

After the Court decided the motions to dismiss, the parties engaged in discovery on the Generic Rx and Omega Integration Claims. Years later, Defendants moved for summary judgment on those claims arguing Plaintiffs unearthed no evidence to show Defendants made material misrepresentations for the challenged statements or that they acted with scienter. [Perrigo Mem. of Law in Support of Summ. J. 9-38 (Perrigo Br.) (Docket No. 343-3); Brown Mem. of Law in Support of Summ. J. 24-39 (Brown Br.) (Docket No. 345); Papa Mem. of Law in Support of Summ. J. 21-28, 30-39 (Papa Br.) (Docket No. 347).] Perrigo also contends Plaintiffs cannot establish loss causation or damages to sustain their securities fraud claims. [Perrigo Br. at 38-55.] The Court turns to these arguments now.

## II. SUMMARY JUDGMENT STANDARD

Courts will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might impact the "outcome of the

suit under the governing law." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 261 (3d Cir. 2012). A dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party. *Id.*

In determining the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable inferences and doubts should be resolved in favor of the nonmoving party. *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010). But a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Moreover, a court need not adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. *Scott v. Harris*, 550 U.S. 372, 380 (2007). In the face of such evidence, summary judgment is still appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The movant has the initial burden of showing through the pleadings, deposition testimony, answers to interrogatories, admissions on file, and any affidavits that the nonmovant has failed to establish one or more essential elements of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party carries its burden, the burden then shifts to the nonmovant who must establish that summary judgment is inappropriate. *Matsushita*, 475 U.S. at 586. But if the nonmoving party "'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial,' then summary judgment is appropriate for the moving party." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (alterations in original) (quoting *Celotex*,

7

477 U.S. at 322).

In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous:  the party "must point to concrete evidence in the record"—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) ("[S]peculation and conjecture may not defeat summary judgment." (citing *Acumed LLC. v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009))).  Moreover, "the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial"; the evidence need not be in admissible form at the time of summary judgment. *FOP v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016).

## III. OVERVIEW OF SECURITIES FRAUD LAW

The Securities Exchange Act of 1934 (Exchange Act) regulates the trading of securities on the secondary market. *Slack Tech., LLC v. Pirani*, 143 S. Ct. 1433, 1437 (2023).  Section 10(b) of the Exchange Act prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  The Securities and Exchange Commission, the agency responsible for implementing Section 10(b) of the Exchange Act, enacted Rule 10b-5 making it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17

8

C.F.R. § 240.10b-5(b).

"Together, § 10(b) and Rule 10b-5 imply a private cause of action for securities fraud." *City of Warren Police & Fire Dep't Retirement Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 679 (3d. Cir. 2023).   To prevail on a securities fraud claim under Section 10(b) and Rule 10b-5, a plaintiff must show:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentations or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; (6) and loss causation."[2] *In re Amarin Corp. PLC Sec. Litig.*, 2022 WL 2128560, at *2 (3d Cir. June 14, 2022) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)); *accord Slack Tech*, 143 S. Ct. at 1437.   Because Defendants' motions focus largely on the material misrepresentations and scienter elements, the Court elaborates on those elements.

To prevail under Section 10(b) and Rule 10b-5, a private plaintiff must first show the defendant made an affirmative material misrepresentation, or in the alternative, bears responsibility for a material omission.  "Material information is 'information that would be important to a reasonable investor in making his or her investment decision.'" *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997)); *see also In re Amarin Corp. PLC Sec. Litig.*, 2016 WL 1644623, at *7 (D.N.J. Apr. 26, 2016) ("Under Section 10(b) and Rule 10b–5, a misrepresentation or

---

[2] Plaintiffs have also brought claims under Sections 14(e) and 20(a) of the Exchange Act.  Section 14(e) liability attaches for misrepresentations and omissions made in connection with a tender offer.  *Roofer's*, 2018 WL 3601229, at *7.  Besides the tender offer setting, the elements to establish Section 14(e) liability are the same as Rule 10b-5.  *Id.*  Section 20(a) imposes liability on certain "control persons."  15 U.S.C. § 78t.  The claim is derivative of a Section 10(b) claim, and so, a plaintiff first needs to establish a violation of Section 10(b) by a control person.  *Roofer's*, 2018 WL 3601229, at * 7.

omission of fact is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision, and there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988))).  "To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002); *see also Fan v. StoneMore Partners LP*, 927 F.3d 710, 715-16 (3d Cir. 2019).

On top of showing the defendant made a material misrepresentation, the "plaintiff must prove that the defendant acted with scienter." *Matrixx*, 563 U.S. at 48.  To make that showing, a plaintiff must show defendant made the challenged misrepresentation either:  (1) intentionally—that is, "a mental state embracing intent to deceive, manipulate, or defraud," *see id.* (quoting *Tellabs, Inc. v. Makor Issue & Rts., Ltd.*, 551 U.S. 308, 319 (2007)), or (2) recklessly—that is, under circumstances showing "an extreme departure from the standards of ordinary care, . . .  which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it," *see In re Ikon Office Sols., Inc.*, 277 F.3d 658, 667 (3d Cir. 2002) (quoting *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000)).

A plaintiff can prove scienter by direct or circumstantial evidence showing:  (1) defendants had a both a motive and opportunity to commit the fraud; or (2) conscious misbehavior or recklessness.  *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *14 (D.N.J. Aug. 17, 2005).  To establish reckless or conscious misbehavior, a plaintiff must show

that defendants either:  (1) "egregious[ly] refused to see the obvious, or [failed] to investigate the doubtful," or (2) had "knowledge of facts or access to information contradicting their public statements such that defendants knew or should have known that they were misrepresenting material facts related to the corporation."  *In re Interpool, Inc. Sec. Litig.*, 2005 WL 2000237, at *12 (D.N.J. Aug. 17, 2005) (quoting *Novak v. Kasaks*, 216 F. 3d 300, 308 (2d. Cir. 2000)).   While scienter is often a jury call, *see SEC v. Ficken*, 546 F.3d 45, 51 (1st Cir. 2008), courts will grant summary judgment if "no reasonable trier of fact could find the element of scienter satisfied" *see In re Merck & Co., Sec., Derivative & "ERISA" Litig.*, 2015 WL 2250472, at *23 (D.N.J. May 13, 2015).   *See also In re Tyson Foods, Inc.*, 2004 WL 1396269, at *9 (D. Del. June 17, 2004) (granting summary judgment because plaintiffs failed to produce evidence to show scienter), *aff'd*, 155 F. App'x 53 (3d Cir. 2005).   To defeat a defendant's summary judgment motion on scienter grounds, a plaintiff "must present significant probative evidence of scienter."  *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1236 (S.D. Cal. 2010) (citation and internal quotation marks omitted).

## IV. DISCUSSION

While Defendants offer varying reasons why Plaintiffs' remaining claims fail, the thrust of their arguments focus on Plaintiffs' failure to establish scienter.   Indeed, securities fraud cases, like the one here, often rise and fall on a plaintiff's ability to prove scienter.   Thus, this Court will largely focus on Plaintiffs' proffered evidence they claim shows Defendants' possessed scienter when making the challenged statements.

### A. Papa's and Brown's Motive and Opportunity to Commit Securities Fraud

Before turning to the Generic Rx and Omega Integration Claims, this Court reviews Plaintiffs' argument that Papa and Brown were motivated to commit securities fraud—that is, they acted with scienter.   While "motive and opportunity" to commit fraud is not "an independent means of establishing scienter," *see In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845, at *32 (D.N.J. Sept. 30, 2011), *aff'd*, 484 F. App'x 742 (3d Cir. 2012), a plaintiff's failure to show motive to commit fraud is "significant," *see Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013).   *See also In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 572 (E.D. Pa. 2009) (dismissing Section 10(b) claim for failure to establish scienter and ruling the "absence of motive here is significant").

At the motion-to-dismiss stage, the Court found Plaintiffs' allegations that Papa and Brown were motivated to commit fraud based on their trading history and efforts to fend off the Mylan takeover lacking.   *Roofer's*, 2018 WL 3601229, at *17-18.   Plaintiffs again rehash their arguments that Papa's and Brown's stock sales and efforts to fight off the Mylan takeover show Papa and Brown had motive to commit fraud.   [Pls. Mem. of Law in Opp'n to Defs. Summ. J. Mot. 34-35, 65-66 (Pls. Br.) (Docket No. 359).]   The completed record, however, does not support Plaintiffs' arguments.

First, undisputed evidence shows Papa and Brown both increased their ownership in Perrigo when Mylan made the tender offer either through vesting of restricted stock awarded years earlier or through compensation.   [Defs. Joint Statement of Undisputed and Material Facts ¶¶ 12, 20 (Defs. SOF) (Docket No. 343-3).]   Further, before Mylan's tender offer, both Papa and Brown sold thousands of their shares in Perrigo.   [Defs. SOF ¶¶ 10, 19.]   *See also Roofer's*, 2018 WL 3601229, at *17 ("[I]t appears undisputed that Papa and Brown sold greater

12

or comparable amounts of Perrigo stock in the 25 months prior to the Class Period than they did during the Class Period.").

That Papa and Brown increased their holdings in Perrigo during Mylan's takeover efforts cuts against finding scienter. *See Adolor*, 616 F. Supp. 2d at 572-73 (ruling allegations that defendants "held onto their shares" and "actually increased their holdings incrementally throughout Class Period . . . raises a compelling inference against scienter"). And given Papa's and Brown's trading history before Mylan's tender offer, the Court finds their trading patterns during the takeover period are not unusual to raise an inference of scienter. *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1104-05 (N.D. Cal. 2006) (ruling allegations did not demonstrate scienter based on insider's trading history because insider sale of 150,000 shares during five-month class period was not unusual since the sale was not "dramatically out of line with . . . prior trading practices," where insider sold 100,000 shares in the two quarters before the class period).

Still, faced with this evidence, Plaintiffs claim Papa nefariously executed trading plans to sell his Perrigo stock before and after Mylan's takeover efforts, and so, an inference of scienter arises. [Pls. Br. at 65-66.] This argument is unpersuasive, and Plaintiffs mischaracterize the record. Before Mylan's tender offer, Papa executed a Rule 10b5-1 plan to sell over 40,000 of his Perrigo shares on various dates at a limit price of $150 per share. [Pls. Statement of Additional Disputed Material Facts in Opp'n to Defs. Mot. for Summ. J. ¶ 5 (Pls. SOF) (Docket No. 359-2).] "A Rule 10b5–1 plan is a written plan that allows corporate insiders to make prearranged stock transactions." *In re Synchronoss Tech., Inc., Sec. Litig.*, 2019 WL 2849933, at *16 n.11 (D.N.J. July 2, 2019). Stock trades made under these plans are not

enough to establish motive and opportunity to commit fraud.  *In re Audible Inc., Sec. Litig.*, 2007 WL 1062986, at *12 (D.N.J. Apr. 3, 2007) ("[T]here is evidence that at least some of these stock sales were made via Rule 10(b)5–1 plans, which would prevent those shares from being considered in the motive and opportunity [scienter] analysis.").  Indeed, "[c]ourts have consistently held that trades made under automatic trading plans are of minimal value in establishing an inference of scienter." *Synchronoss*, 2019 WL 2849933, at *16 (cleaned up) (quoting *Lovallo v. Pacira Pharm., Inc.*, 2015 WL 7300492, at *13 (D.N.J. Nov. 18, 2015)).  In any event, Papa cancelled that trading plan after Mylan made the tender offer, see Pls. SOF ¶ 5, because he "didn't feel that the CEO trading during that time period would be appropriate," see Ex. 500 (Papa Tr. 194:20-23) (Docket No. 365-4).  After Mylan's tender offer expired, Papa executed another Rule 10b5-1 and sold over 10,000 of his personal shares under the plan.  [Pls. SOF ¶ 5; see also Ex. 6 (Docket Nos. 353-7, -8, -9).]

Because Papa's trades were made under a Rule 10b5–1 plan, this Court finds the trades insufficient to establish Papa's motive and opportunity to commit fraud.  *Audible*, 2007 WL 1062986, at *12.  Even though Papa sold over 10,000 of his shares after Mylan's failed takeover, this Court finds those trades cannot establish scienter given Papa's trading history. *See Pixar*, 450 F. Supp. 2d at 1104-05.  Indeed, those 10,000 shares represent a fraction of the shares Papa sold before Mylan's tender offer.  *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 875 (N.D. Cal. 2004) (finding CEO sales of between 17% to 21% of his stock during the class period "not suspicious enough to raise a strong inference of scienter").  Thus, even viewing the evidence in the light most favorable to Plaintiffs, the Court finds Papa's and Brown's trading patterns insufficient to establish scienter.

14

Second, Plaintiffs contend Mylan's takeover efforts motivated Papa's and Brown's statements about the success of the Omega integration to defeat the takeover. [Pls Br. at 34-35.] The Court previously considered this argument and rejected it. *Roofer's*, 2018 WL 3601229, at *18. The Court noted that mostly "all publicly traded companies are interested in . . . avoiding hostile takeovers" and that executives want to fight off a hostile takeover "fall woefully short of demonstrating scienter under federal securities law." *Id.* (internal quotation marks omitted) (quoting *In re Goodyear Tire & Rubber Co. Sec. Litig.*, 1993 WL 130381, at *16 (E.D. Pa. Apr. 22, 1993)). Plaintiffs' arguments have not persuaded this Court to deviate from its earlier findings.

In the end, the Court finds Plaintiffs have not shown Papa and Brown were motivated to commit securities fraud based on their trading patterns and efforts to thwart Mylan's takeover. Because "motive and opportunity" to commit fraud is not "an independent means of establishing scienter," *Anadigics,* 2011 WL 4594845, at *32, this Court will now consider whether Plaintiffs have established scienter on their Generic Rx and Omega Integration Claims through circumstantial evidence of conscious misbehavior or recklessness, *Roofer's*, 2018 WL 3601229, at *18.

## B. The Generic Rx Claim

During the relevant class period, Perrigo had mainly five business units: (1) Consumer Healthcare; (2) Branded Consumer Healthcare; (3) Prescription Pharmaceutical (Generic Rx); (4) Specialty Sciences; and (5) Other—the company's active pharmaceutical ingredient business. [Defs. SOF ¶ 2.] The Generic Rx unit marketed about 800 generic prescription drugs and over-the-counter products with over 1,400 SKUs (stock keeping units). [*Id.* ¶ 125.]

15

Generally, the company's individual business units determined the pricing for the company's products.  [*Id.* ¶¶ 224-25.]   The Generic Rx unit had a pricing committee consisting of members from the company's generic drug contracts, marketing, sales, forecasting, and finance teams.  [*Id.* ¶ 227.]

The parties dispute who had the final say on pricing for Perrigo's generic drugs. Defendants contend John Wesolowski (Wesolowski), who held various executive titles at Perrigo, had "the ultimate decision-making authority" on generic drug pricing.  [*Id.* ¶¶ 128, 228.]  Plaintiffs argue that a committee set the pricing, and former Perrigo employee Tony Polman—who Plaintiffs claim was enmeshed in collusive behavior with other competitors— sat on that committee.  [Pls. SOF ¶¶ 208, 217; see also Pls. Response to Defendants' Joint Statement of Undisputed and Material Facts ¶ 228 (Pls. Res.).]  That dispute aside, all agree Papa and Brown did not sit on any pricing committee.  [Defs. SOF ¶¶ 229, 232.]  Still Plaintiffs contend Papa and Brown took part in generic pricing decisions because:  (1) the executive committee that Papa and Brown sat on "very well could have" discussed drug pricing, see Ex. 170 (Perrigo Rule 30(b)(6) Tr. 35:2 to 6); (2) "sometimes . . . senior management" like Brown or Papa provided "input" on generic drug pricing, see Ex. 179 (Boothe Tr. 27:23 to 28:15) (Docket No. 359-27); and (3) Brown's "organization" would review pricing actions, see *id.* (Boothe Tr. 190:8 to 191:11).

Plaintiffs argue Defendants committed securities fraud by:  (1) concealing Perrigo's involvement in a price-fixing scheme with other pharmaceutical companies;  (2) misrepresenting the competitive environment of generic drugs; and (3) misrepresenting Perrigo's drug pricing policy.  [Pls. Br. at 65-66; see also Am. Compl. ¶¶ 176-79, 180-81, 182-

16

86, 190-97, 200-04.]   Because Plaintiffs largely base their Generic Rx Claim on the failure to disclose an illegal price-fixing scheme, they must show the "underlying conduct occurred." *Roofer's*, 2018 WL 3601229, at *11 (quoting *Menaldi v. Och-Ziff Cap. Mgmt. Grp.*, LLC, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016)).   To do so, Plaintiffs must show—either by direct or circumstantial evidence—an agreement to fix prices.   *Id.*   The Third Circuit has identified a list of "plus factors" that tend to suggest the existence of collusion, such as evidence showing: (1) a motive to conspire to fix prices; (2) the defendant "acted contrary to its interests;" and (3) "a traditional conspiracy."   *Lifewatch Servs. Inc. v. Highmark, Inc.*, 902 F.3d 323, 333 (3d Cir. 2018) (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321-22 (3d Cir. 2010)).

At the motion-to-dismiss stage, the Court found that Plaintiffs' "allegations related to the price-fixing scheme . . . *narrowly* surpassed the bar for pleading scienter."   *Roofer's*, 2018 WL 3601229, at *22 (emphasis added).   Now, with the benefit of discovery, the Court finds Plaintiffs have not passed the high scienter bar to move this case forward to a jury as to Brown and Papa.

### 1. Brown

Plaintiffs claim Brown committed securities fraud based on eight statements she made on generic drug pricing:  five in SEC filings, two on investor calls, and one at a conference. [Am. Compl. ¶¶ 184, 192, 194, 196, 200-01, 203.]

For the SEC filings, Plaintiffs challenge Brown's statements that "Perrigo operated in a highly competitive environment" and "faced vigorous competition from other pharmaceutical companies that may threaten the commercial acceptance and pricing of our products," see Defs. SOF ¶¶ 303 (Perrigo's Form 10-K (August 13, 2015)), 305 (Perrigo's

17

Form 10-KT (February 25, 2016)), and that Perrigo suffered a "recent reduction in pricing expectations in our U.S. businesses from historical patterns, in particular in our Rx segment due to industry and competitive pressures," see *id.* ¶¶ 307 (Perrigo's Form 10-Q (May 16, 2016)), 309 (Perrigo's Form 10-Q (August 10, 2016)), and 311 (Perrigo's Form 10-Q (November 10, 2016)).  As to Brown's statements on investor calls, Plaintiffs challenge her statements that "pricing wise, [Perrigo] did see some pressure, give or take, in the total portfolio over the course of the year, approximately 1%," and "sharp price erosion in a number of topical products" and "continued pricing had further impacted [Perrigo's] ability to execute on [its] planned pricing strategies."  [*Id.* ¶¶ 304 (February 18, 2016 call), 306 (May 12, 2016 call) (alterations in original and internal quotation marks omitted).]  Finally, Plaintiffs challenge Brown's statement at a conference where she told investors Perrigo "saw some competitive pressure and was seeing a different pricing dynamic for the remainder of the year."  [*Id.* ¶ 308 (May 24, 2016) (internal quotation marks omitted).]

Plaintiffs offer several reasons why Brown acted with scienter when she made the above statements.  None, however, are persuasive.  First, they contend Brown held herself out as knowledgeable about Perrigo's drug pricing by answering pointed questions from analysts, and so, an inference of scienter arises.  [Pls. Br. at 59.]  Because she had personal knowledge, the argument goes, she either knew the "truth" about Perrigo's pricing practices—that Perrigo was colluding with competitors—or was reckless in not finding out the "truth." [*Id.*]

True, some courts have found that a corporate officer's responses to analysts' questions that imply first-hand knowledge of a particular matter, while not conclusive, can bolster an

inference of scienter.  *See, e.g.*, *In re PTC Thera. Inc. Sec. Litig.*, 2017 WL 3705801, at *17 (D.N.J. Aug. 28, 2017).   But Brown's knowledge of Perrigo's pricing practices does not mean she knew of, or was reckless in not finding out, a supposed price-fixing scheme even if Perrigo's generic drug operations were key to the company's business.  *See Utesch v. Lannett Co.,* 316 F. Supp. 3d 895, 906 (E.D. Pa. 2018) (finding allegations did not support an inference of scienter because knowledge about a company's drug pricing—even if a "core operation" of the company—does not mean the speaker knew about illegal activities involving pricing). Indeed, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegations of specific information conveyed to management and related to fraud." *Rahman*, 736 F.3d at 247 (citation and internal quotation marks omitted).  Brown's statements suggest she knew about Perrigo's overall drug prices, not that she knew how Perrigo came to a price determination for each drug in the company's portfolio and whether collusion with other competitors influenced that price determination.

Second, Plaintiffs contend a jury could infer scienter from internal documents Brown reviewed before she made the challenged statements.   [Pls Br. at 59-60.]  In some cases, a plaintiff can establish scienter by showing the defendants had "knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308.  This Court has viewed the documents Plaintiffs rely on (generously in their favor) and they offer Plaintiffs no support.  Those documents, in fact, show Brown's challenged statements align with the information she received.  Indeed, the very documents Plaintiffs point to that Brown received in 2015—reports projecting declines in generic drug pricing, price erosion because of

19

increased competition, minimal opportunities for generic drug pricing, greater competition across the portfolio, and generic drug pricing $11 million lower than internal estimates—mirror Brown's statements Plaintiffs claim are fraudulent.   [Pls Br. at 59-60; see also Exs. 183 (April 2015 email with report) (Docket No. 359-31), 242 (April 2015 email with report) (Docket No. 359-87), 245 (July 2015 email with report (PRGO_SECLIT0002489286) (Docket No. 359-90), 241 (September 2015 email with report) (Docket No. 359-86), 246 (2015 report) (Docket No. 359-91), and 295 (2015 report) (Docket No. 360-40).]  No reasonable jury could infer Brown recklessly spoke about Perrigo's generic drug pricing and the competitive environment for generic drugs given the documents she had.  *See In re Symbol Tech. Class Action Litig.*, 950 F. Supp. 1237, 1245-46 (E.D.N.Y. 1997) (granting summary judgment because plaintiffs failed to establish scienter since a "jury would have nothing upon which it could base a finding that defendants had the requisite intent" because "all of the internal documents support the assessments and projections in the three statements at issue").

Third, Plaintiffs argue a jury could find scienter based on documents outlining various penalties that Perrigo pays wholesalers when the company increases the "Wholesale Acquisition Cost" (WAC) for certain drugs and the millions Perrigo had paid in penalties for doing so.  [Pls Br. at 60-61; see also Exs. 278 (Docket No. 360-23 & 279 (Docket No. 360-24).]  According to Plaintiffs, Brown (and Papa) would incur these penalties because they "believed a lack of competition would allow the price increases to stick."  [Pls Br. at 61.]  By example, Plaintiffs point to a slide show Brown received stating that Perrigo increased the WAC for econazole by 950%, incurring about $6.8 million in penalties.  [*Id.* at 61-62; see also Ex. 274 (Docket No. 360-19).]  According to Plaintiffs, Perrigo off-set those penalties in the

following fiscal quarters.  [*Id.*]

Plaintiffs unreasonably stretch the inferences to be drawn from the evidence.  At best, the evidence shows Brown knew that if Perrigo increased the WAC for generic drugs, Perrigo had to pay a contractual penalty to the wholesaler, and Perrigo had paid millions in penalties. Nothing in the evidence supports Plaintiffs' strained inference that Brown (or Papa) knew Perrigo could only overcome the price penalty if a competitor too increased the WAC, and so, Perrigo and its competitors colluded with each other.  Again, an executive's knowledge about pricing is different from knowing about an illegal pricing scheme.  *Utesch,* 316 F. Supp. 3d at 906.  In fact, one would expect a pharmaceutical company's CFO (and CEO like Papa) to know about the company's drug pricing, but that knowledge does not mean the CFO knew about illegal activities with pricing.  *Cf. Rahman*, 736 F.3d at 245 ("[T]he fact that a CEO visited a subsidiary's premises to meet with its president will not establish that the CEO had knowledge of illegal activities at the subsidiary.  After all, it would be expected that the CEO would visit his company's subsidiaries in the course of conducting legitimate business.").

Fourth, Plaintiffs assert record evidence shows Brown and Papa were personally involved in generic drug pricing.  Plaintiffs rely mainly on testimony from two executives from Perrigo's generic drug business, Douglas Boothe (Boothe) and Wesolowski, and Perrigo's corporate designee who testified that senior management took part in drug pricing. [Pls Br. at 63.]  Boothe testified that "sometimes . . . senior management" like Brown or Papa provided "input" on generic drug pricing.  [Ex. 179 (Boothe Tr. 27:23 to 28:15) (Docket No. 359-27).]  Plaintiffs claim Boothe also testified that he "would not put forward a pricing action until . . . someone from [Brown's] organization" reviewed it.  [Pls Br. at 63 (citing Ex. 179

(Boothe Tr. 190:8 to 191:11).]  Wesolowski testified that when price changes were made, "because of the financial implications being mostly negative at the front end of it," the pricing committee informed Boothe, who, in turn, "would normally take that to [Brown] and then it would cascade back."  [Ex. 171 (Wesolowski Tr. 83:16 to 25).]  Perrigo's corporate designee testified it "very well could have happened" that Perrigo's executive committee discussed generic drug pricing.  [Ex. 170 (Perrigo Rule 30(b)(6) Tr. 35:2 to 6).]

Plaintiffs mischaracterize the record by placing the relevant testimony out-of-context. Boothe testified that since a pricing action "could have an effect of negative revenues or other implications on the reported revenues for the division, which could spill across the entire company," his "practice" was to have "someone from [Brown's] organization" review the matter to "make sure there was no lack of understanding" of those implications.  [Defs. SOF ¶ 246 (citing Ex. 92 (Boothe Tr. 190:15 to 91:11)); see also Ex 93 (Wesolowski Tr. 84:21 to 85:3 (testifying that Boothe informed Brown on "WAC AWP change[s] that could negatively affect the financials of the company").]  Boothe testified "it was more of a communication" matter than approval.  [Ex. 179 (Boothe Tr. 191:12 to 18).]  Thus, the evidence shows Brown learned about drug pricing that could harm the company's finances.  [See Def. SOF ¶ 231 (citing to Perrigo's Director of Marketing who testified Brown was not "involved in increasing the prices for any generic drugs" and would learn about price increases through "reporting in later business reviews").]

The record shows that Brown was not a member of any Perrigo drug pricing committee and she was not involved in setting pricing for the company's generic drugs.  [Def. SOF ¶¶ 229-30.] According to Perrigo's former Director of Marketing, James Booydegraaf, Brown

would only learn about price increases through "reporting in later business reviews." [*Id.* ¶ 231 (citing Booydegraaf Tr. 42:18 to 43:2).][3]  Even if Brown learned about price increases, Plaintiffs have presented no evidence that she learned of the reasoning for the increases—that is, whether the increases flowed from collusive behavior or not.  That the executive committee "very well could have" discussed generic drug pricing is pure conjecture. Plaintiffs offer nothing on what was said at those meetings even though they had years of discovery to explore more than the "what could have been."  *See In re Asbestos Prods. Liability Litig.*, 2014 WL 6988692, at *2 (D. Del. Dec. 9, 2014) ("Plaintiff only offers the *possibility* that [the injured] worked on AM General vehicles in Fulda, but mere speculation is insufficient to raise a genuine dispute of material fact.").

Finally, Plaintiffs contend a jury can infer scienter based on Brown's (and Papa's) attendance at pharmaceutical industry conferences attended by Perrigo's competitors.  [Pls Br. 64.]  According to Plaintiffs, Perrigo's "largest price increase actions in 2013-2014" followed many of those conferences.   [*Id.*; see also [Ex. 160 (Docket No. 359-8).]  Plaintiffs point to an email discussing price increases after a 2013 industry conference.  [Ex. 284 (Docket No. 360-29).]  This argument is entirely speculative because, beside her mere presence at those conferences, Plaintiffs—after years of discovery—offer no evidence on who Brown spoke to, what was said about generic drug pricing (if any), or what she heard at those conferences. And neither Brown nor Papa are copied on the email discussing price increases.  Plaintiffs' speculation cannot defeat summary judgment.  *Jackson*, 594 F.3d at 227 ("[S]peculation and

---

[3] Pointing to Boothe's, Wesolowski's, and Perrigo's corporate designee's deposition testimony, Plaintiffs dispute those paragraphs of Defendants' Joint Statement of Material Facts.  [Pls. Resp. ¶¶ 230-31.]  This Court finds those disputes are not genuine because Plaintiffs have unfortunately taken the relevant deposition testimony out-of-context.

conjecture may not defeat summary judgment.").

After viewing the evidence in the light most favorable to Plaintiffs, this Court finds they have presented no probative evidence to show Brown possessed scienter when she made the challenged statements.  Without proof of scienter, the Generic Rx Claim against her fails. *Merck*, 2015 WL 2250472, at *14 (granting summary judgment because plaintiffs failed to present evidence to permit a jury to find that, based on the information defendant had at the time of the challenged statements, defendant knowingly or recklessly deceived the public).

### a.   Plaintiffs cannot hold Defendants liable for Brown's October 22, 2015 Statement

In their opposition papers, Plaintiffs seek to hold Brown and Perrigo liable for her October 22, 2015 statement she made on an earnings call that Perrigo's "revenues are insulated from the current pricing drama you see playing out in the pharmaceutical industry today."  [Ex. 76 (PRGO_SECLIT0001345412) (Docket No. 349-21); see also Pls Br. at 60.] Plaintiffs did not plead this statement in their Amended Complaint, and cannot now inject this statement into the case to hold Brown liable for securities fraud.  Indeed, Plaintiffs admit the Amended Complaint does not reference Brown's October 2015 statement.  [Pls. Br. at 13.]

The October 2015 statement forms a new fraud theory on Perrigo's generic drug pricing—that is, Defendants failed to disclose increased competition and downward pricing pressure.  *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *6, *11 (D.N.J. July 31, 2019) (lawsuit filed by opt-out plaintiffs from current class action against same Defendants raised "a new theory" based on Brown's October 2015 statement that "Defendants violated securities laws by making misrepresentations and omissions to investors about the stability and sustainability of Perrigo's drug pricing, while failing to disclose

increased competition and downward pricing pressure in the generic drug market"). That theory is different from the one pled in the Amended Complaint. As pled, Plaintiffs claim Defendants committed securities fraud by engaging in a price-fixing scheme with their competitors, failing to disclose that scheme, and failing to disclose a lack of competition. *Roofer's*, 2018 WL 3601229, at *3.

Courts have rejected a plaintiff's attempt to inject new theories for securities fraud to oppose summary judgment, and this Court will too. *In re Saint Jude Med., Inc., Sec. Litig.*, 629 F. Supp. 2d 915, 920-21 (D. Minn. 2009) (refusing to consider new fraud theory raised to oppose summary judgment because to consider the theory would defeat Congress' purposes of enacting the Private Securities Litigation Reform Act (PSLRA) that requires private securities complaints to "specify each statement alleged to have been misleading," as well as the "reason or reasons why the statement is misleading" (quoting 15 U.S.C. § 78u-4(b)(1)(B))); *cf. In re Bristol-Myers Squibb Sec. Litig.*, 228 F.R.D. 221, 230 (D.N.J. 2005) (refusing to allow plaintiffs to amend complaint to include new statements because allowing the amendment "would frustrate the heightened pleading requirements of the PSLRA"). If Plaintiffs wanted to hold Defendants liable for a new fraud theory based on Brown's October 2015 statement, they should have moved to amend their complaint. They did not, and summary judgment is not the proper vehicle to drive this new fraud theory. *Saint Jude*, 629 F. Supp. 2d at 921 ("Plaintiffs survived a motion to dismiss in light of the theories they, themselves, chose; they may not now evade Congress's PSLRA mandates by switching horses midstream and pursuing a new theory.").[4]

---

[4] Plaintiffs cannot seek refuge in *Chabot v. Walgreens Boots All., Inc.*, 2023 WL 2908827 (M.D. Pa. Mar. 31, 2023) because there, unlike here, "Plaintiffs provided sufficient notice [that the challenged] statement might be at issue

25

### 2.  Papa

Plaintiffs contend Papa committed securities fraud when he spoke about Perrigo's drug pricing policy and the competitive environment for generic drugs.  They challenge several of Papa's statements where he stated he tried to "keep pricing flat to up slightly."  [Am. Compl. ¶¶ 176 (April 21, 2015), 178 (May 12, 2015), 180 (June 2, 2015), 182 (August 5, 2015), 186 (October 22, 2015), 190 (January 5, 2016).]  And they challenge Papa's statements that it's a "competitive market out there" for generic drugs, "we think there's still opportunities to do pricing" for generic drugs, and "we're recognizing that there is going to be some products in Rx that I'm going to have to decrease for competitive reasons as well as increase some."  [Am. Compl. ¶¶ 178  (May 12, 2015), 180 (June 2, 2015), 182 (August 5, 2015).]

Besides a note from a customer complaining about the cost of a particular generic drug, Plaintiffs muster the same evidence and arguments against Papa to establish scienter as they did for Brown.  [Pls. Br. 58-64.]  For the reasons already discussed, that evidence is not enough to show that Papa recklessly spoke about the competitiveness of the generic drug market or that he engaged in conscious misbehavior.  As noted, a corporate executive's general knowledge about drug pricing does not mean the executive knew about a price-fixing scheme or that price increases resulted from illegal activity.  *Utesch,* 316 F. Supp. 3d at 906.  That Papa knew Perrigo had contractual obligations to pay penalties and had paid penalties for raising WAC does not mean that he knew about illegal activity related to pricing (or that he knew that Perrigo raised the price because of collusion).  *See Rahman*, 736 F.3d at 247 ("[C]orporate

---

*when they quoted it at length in their complaint." Id.* at *35 n.7 (emphasis added).  As noted above, the Amended Complaint is devoid of any allegation on Brown's October 2015 statement as Plaintiffs have admitted.  [Pls. Br. at 13.]

management's general awareness of the day-to-day workings of the company's business does not establish scienter." (citation and internal citation marks omitted)).

Moreover, the internal Perrigo documents Plaintiffs point to (discussed above) do not establish Papa's scienter. Several of those documents contain information mirroring Papa's statements that Plaintiffs claim violate federal securities law. For example, in July 2015, Papa received an internal report alerting him about "minimal price increase opportunities." [Pls. Br. 36, 60.] He told investors a month later he thought there was "still opportunities to do pricing." [*Id.*] Given the information Papa had, no reasonable juror could find he recklessly spoke about the competitiveness of the generic drug market. *In re Symbol Tech. Class Action Litig.*, 950 F. Supp. at 1245-46.

Further, the various documents Papa (and Brown too) received do not support a reasonable inference Papa knew about a price-fixing scheme. For example, Plaintiffs point to a PowerPoint presentation given to Perrigo's Board of Directors in October 2015. [Ex. 271 (Docket No. 360-16).] Plaintiffs focus on one slide on generic drugs "[m]arket dynamics/[u]pdate" stating "pricing environment more difficult" because "[u]p front costs are significant" and "[d]rug pricing now 'in the news.'" [*Id.* (PRGO_SECLIT0002478598).] Based on that presentation, Plaintiffs argue Perrigo's internal acknowledgment of government and public scrutiny on generic drug pricing "is more consistent with illicit collusion than legal oligopolistic conduct." [Pls. Br. at 53.] Nothing in this document (even viewed generously in Plaintiffs favor) supports any inference on Papa's knowledge of a price-fixing scheme involving Perrigo. Said another way, a jury could not look at this document and reasonably conclude Papa either knew about illegal collusive behavior or turned a blind eye to a

27

price-fixing scheme because he learned generic pricing is "now in the news."

Like Brown, Plaintiffs' remaining arguments against Papa are speculative and cannot defeat summary judgment. *Jackson*, 594 F.3d at 227. That Papa attended pharmaceutical industry conferences—without more—does not establish scienter. Again, after years of discovery, Plaintiffs offer no evidence on who Papa spoke to at those conferences, what was said, or what he heard. Like Brown, Plaintiffs rely on Papa's mere presence at the conferences followed by a price increase. But Plaintiffs offer no evidence to connect Papa to the price increase. And they offer no evidence to support a reasonable inference that Papa knew of the price increase or the reason for it.

Likewise, Plaintiffs unfortunately mischaracterize the record by arguing Papa was personally involved in generic drug price increases. [Pls Br. 63.] The undisputed evidence shows Papa was not a member of any drug pricing committee. [Def. SOF ¶ 232.] Even if the executive committee "very well could have" discussed generic drug pricing, Plaintiffs again offer nothing on the contents of those discussions to support a reasonable inference that Papa knew about price colluding, or recklessly disregarded information suggesting the existence of a collusive scheme. Again, Plaintiffs only offer speculation, which cannot defeat summary judgment. *In re Asbestos Prods. Liability Litig.*, 2014 WL 6988692, at *2.

In a last-ditch effort, Plaintiffs try too hard to stretch the inferences to be drawn from a sole customer's complaint sent to Papa's attention. [Pls. Br. at 53; see also Ex. 272 (Docket No. 306-17). In November 2014, a customer wrote to Papa complaining about a "6-fold" price increase for one of Perrigo's generic products, jumping from $48 to about $242 over a 15-month timeframe. [Ex. 272.] From this evidence, Plaintiffs claims Papa "was well aware

28

of the magnitude of price increases Perrigo was implementing." [Pls. Br. at 53.]  Even viewing this customer's complaint in Plaintiffs favor, it does not a support a reasonable inference that Perrigo's price increases were part of a price-fixing scheme with the company's competitors or that Papa knew of the scheme.  Once more, knowing about price increases is different from knowing about an illegal pricing scheme.  *Utesch,* 316 F. Supp. 3d at 906.

Turning to Papa's challenged "flat to up slightly" statements on Perrigo's pricing strategy, Plaintiffs contend those statements "were materially false and misleading[] because Perrigo's actual pricing strategy was to wildly increase pricing in noncompetitive Generic Rx drugs to mask growing price erosion in the remainder of Perrigo's Generic Rx portfolio." [Pls. Br. at 55.]  Pointing to Papa's October 2015 statement, Plaintiffs contend the "flat to up slightly" policy did not apply "just on a portfolio basis" as Papa claims, but rather, "at product, category, and business segment levels." [*Id.*]  Plaintiffs cherry-pick Papa's statements in a misleading effort to manufacture an issue of fact.

Take Papa's October 2015 statement for example.  When making their argument that Papa's "flat to up slightly" comments applied to each product, Plaintiffs omit Papa's preceding remarks to the analyst's question.  Indeed, when asked about drug pricing, given that "financial markets have become very concerned about the price inflation component of growth also on the generic and brand side going forward," Papa responded that:

> On the question on pricing, certainly, we see that out in the marketplace.  But I would remind the audience today that what we've always said about pricing is that our pricing across our total book of business is flat to up slightly.  While there may be a product that we do raise the price on, there are other products we're taking price down.  Our total strategy for pricing, as I have said I think on numerous calls, is keep pricing flat to up slightly, which means that yes, some products we may attempt to the

raise price there, but in another products we're bringing the price down.  So think about us as keeping pricing flat to up slightly as really the way we're going to look at our total portfolio.

Whether we're talking about any specific product or any specific category or any segment of our business, the overall comment is flat to up slightly for our pricing.  And I think that's really the best place for the long, sustainable consistent approach to pricing that we've bad in the past and will in the future.

[Ex. 76 (PRGO_SECLIT0001345425 to 26) (Docket No. 349-21).]

Plaintiffs cling to Papa's words—"Whether we're talking about any specific product or any segment of our business"—to support their argument that Perrigo's "flat to up slightly" policy applied to each generic drug.   To make this argument, Plaintiffs ignore what Papa said a few breaths before.  When placed in proper context, there is no "issue for trial" on what Papa said.  His words are clear:  the "flat to up slightly" policy applied "across our total book of business"—that is, the company's "total portfolio."  Papa's actual words refute Plaintiffs' argument.  *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1126-27 (S.D. Cal. 2020) (dismissing Section 10(b) claim for challenged statement and ruling "Plaintiff may not simply cherry-pick portions of Defendants' statements and ignore other portions, but must instead account for the entirety of the statements on which they rely.") (cleaned up).  Indeed, before and during the class period, Papa reiterated that his "flat to up slightly" pricing policy applied to Perrigo's company-wide portfolio.  [Ex. 41 (Papa on February 5, 2015 earnings call stating, "First comment I offer is that across the total Perrigo portfolio, our goal is always to keep pricing flat to up slightly.")  (PRGO_SECLIT0001605877) (Docket No. 353-48); Ex. 124 (Papa at May 12, 2015 healthcare conference stating, "But I will caution everybody – our approach in our total business is to keep our pricing flat to up slightly.")

(PRGO_SECLIT0001407601 (Docket No. 353-131); Ex. 123 (Papa at June 2, 2015 healthcare conference stating, "The approach we take on pricing is really a portfolio approach . . . . Across all the Perrigo segments, the consumer segment, the nutrition segment, the Rx segment, and the API segment, we try to take a view on pricing across that total portfolio, with a goal of keeping our pricing flat to up slightly.") (PRGO_SECLIT0002495403 to 04) (Docket No. 353-130).]

Still undeterred, Plaintiffs press on, arguing that, regardless if Papa's statements applied to specific products or not, there is "extensive evidence" from which a jury could find Perrigo's pricing strategy was affirmatively false and misleading by omission because Perrigo issued "waves" of price increases just before the class period in select drugs, including "significant" price increases for some generic drugs. [Pls. Br. at 56-57.] Wrong. Plaintiffs once again ignore Papa's words. For example, on a January 2016 earnings call, Papa reiterated his goal is "to keep my pricing flat to up slightly" either by "tak[ing] some products up, and some products can be competition and I'm taking them down." [Ex. 43 at 15 (Docket No. 348-61).] He then acknowledged that "there may be more volatility up or down" in pricing for generic drug products. [*Id.*]

All in all, Plaintiffs have pointed to no probative evidence suggesting that either Papa knew about an illegal pricing fixing scheme, or that he acted recklessly in not finding out if one existed. When viewed in the proper context, Papa's statements on pricing and the competitive nature of generic drugs are not misleading. Rather, Plaintiffs have tried to manufacture an issue of fact for their Generic Rx Claim against Papa by mischaracterizing the record evidence and warping his words. This is troubling. At any rate, Plaintiffs'

"evidence" does not support an inference of scienter against Papa, and so, this Court grants Papa's summary judgment motion on the Generic Rx Claim. *Merck*, 2015 WL 2250472, at *14.

### 3. Perrigo

At bottom, Perrigo offers two reasons why the Generic Rx Claim against it fails. [Perrigo Br. at 9-32, 36-38.] First, Perrigo argues Plaintiffs have not established the existence of a price-fixing scheme among Perrigo and its competitors, and therefore, Defendants' failure to disclose that scheme did not render their statements on generic drugs false or misleading. [*Id.* at 10-12.] Perrigo contends Plaintiffs' evidence only shows the company operated in an oligopolistic market, and thus parallel pricing among competitors is not evidence of collusion. [*Id.*] And it argues Plaintiffs' remaining evidence—calls between Perrigo and its competitors, price increases following industry conferences, social interactions between Perrigo employees and its competitors, and Perrigo's monitoring of its competitors' pricing—cannot establish the existence of a conspiracy to fix prices. [*Id.* at 12-22.] Second, Perrigo contends Plaintiffs have not established scienter against Papa and Brown on the Generic Rx Claim, and so, that claim against the company falls by the wayside. [*Id.* at 36-38.]

Plaintiffs offer many arguments opposing Perrigo's summary judgment motion. Plaintiffs contend they have both "direct" and "circumstantial" evidence of Perrigo's involvement in a price-fixing scheme with its competitors. [Pls. Br. at 38-53.]

First, they offer a Deferred Prosecution Agreement (DPA) executed by Sandoz, Inc., another pharmaceutical company and one of Perrigo's competitors. [Pls. SOF ¶¶ 196-97.] Under the DPA, Sandoz agreed to pay a multi-million-dollar criminal penalty for "conspiring

to allocate customers, rig bids and fix prices for generic drugs." [*Id.* ¶ 196.] In the DPA, Sandoz admitted that from about July 2013 to December 2015, the company conspired with "Company B"—a generic drug company having its principal place of business in Michigan— to "suppress and eliminate competition" by agreeing to allocate customers through rig bidding and price-fixing for "certain generic drugs, including desonide ointment." [*Id.* ¶ 197.] To connect the dots to Perrigo, Plaintiffs offer an affidavit from Sandoz' Vice President and Chief Ethics, Risk, Compliance Officer, and member of Sandoz' Executive Committee, Edward Stueck (Stueck). [*Id.* ¶ 197; see also Ex. 121 (Docket No. 349-68).] Stueck declares that Perrigo is "Company B" referenced in the DPA, and "[i]f called to testify in this matter, Sandoz would confirm" the contents of his affidavit. [Ex. 121 ¶¶ 3-4.] Plaintiffs have also offered a letter from Sandoz' outside counsel confirming that "Sandoz will appear, through a corporate representative, to testify at trial" here. [Ex. 161.]

Second, Plaintiffs rely on an affidavit from Sandoz Executive Anthony Thomassey (Thomassey) who certifies to certain allegations in a complaint that various State Attorneys General filed against Perrigo and other pharmaceutical companies for, among other things, illegal price-fixing for generic drugs (State AG Complaint). [Pls. Br. 41-42; see also Exs. 116, 159 (Docket Nos. 349-63, 359-5, -6, & -7).] The State AG Complaint alleges that "CW-6" communicated over 300 times with Tony Polman (Polman), a Perrigo sales executive, with the "goal" to "always to keep prices as high as possible." [Pls. SOF ¶ 208.] Thomassey declares that he is CW-6, the information the State AG Complaint attributes to him "is true and accurate," and he is willing to testify to confirm the contents of his affidavit if needed. [Ex. 116.] The State AG Complaint outlines many phone calls between Thomassey and

33

Polman surrounding price hikes for various generic drugs. [Pls. SOF ¶¶ 209-212, 213.] While Perrigo disputes the State AG Complaint provides information on the contents of their calls, Perrigo does not deny the calls occurred. [Defs. J. Reply to Pls. Statement of Additional Disputed Material Facts in Opp'n to Defs. Mot. for Summ. J. ¶¶ 209-212, 213 (Defs. Resp.) (Docket No. 365-1).]

Third, Plaintiffs offer a variety of circumstantial evidence. They offer evidence suggesting Perrigo did not want to bid for business based on current market share. [Pls. Br. at 46-47 (collecting record evidence).] They also point to steep increases for certain generic drugs, such as a 400% price increase for desonide cream and an over 700% increase for econazole (to name a few). [*Id.* at 47.] And Plaintiffs point to hundreds of communications between Perrigo employees and other pharmaceutical companies. [*Id.* at 47-48 (collecting record evidence).] Perrigo does not dispute that the State AG Complaint "documents hundreds of communications between Perrigo employees and other Generic Rx manufacturers," as well as additional calls between Polman and other pharmaceutical employees. [Def. Resp. ¶¶ 225-27.] Again, Perrigo disputes the State AG Complaint reveals the contents of those communications. [*Id.*] Moreover, the State AG Complaint names both Boothe and Wesolowski as defendants. [Ex. 159.] The State AG Complaint outlines many communications between Boothe and Wesolowski and various pharmaceutical companies' representatives. [Pls. SOF ¶¶ 228-29, 232-34.] For example, Boothe "spoke to a generic drug executive at Taro multiple times on July 24, 2014, the same day Perrigo increased its WAC price for econazole by 600%, which was promptly followed by a matching increase by Taro." [*Id.* ¶ 233.] Again, Perrigo does not dispute the calls discussed in the State AG Complaint

occurred.  [Def. Resp. ¶¶ 228-29, 232-34.]

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds Plaintiffs have barely raised just enough facts to show a genuine issue of fact exists on the existence of a price-fixing scheme for generic drugs and Perrigo's participation in that scheme with its competitors.

For Plaintiffs' "direct" evidence of collusion, Perrigo largely argues the evidence is inadmissible hearsay, and so this Court should not consider it.  [Perrigo Reply Mem. of Law in Support of Sum. J. 7-9, 14-17 (Perrigo Reply Br.) (Docket No. 365); see also Perrigo Br. at 24-28.]   Yet Plaintiffs have explained "the admissible form" they anticipate for their "direct evidence"—live testimony from a Sandoz corporate representative and Thomassey on Perrigo's involvement in a price-fixing scheme for generic drugs—and "[t]hat is all that [is] required" for now.  *FOP*, 842 F.3d at 238-39 (reversing district court's decision refusing to consider hearsay on summary judgment motion because plaintiff identified declarants and "nothing suggests that those declarants would be unavailable to testify at trial"); *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542-43 (3d Cir. 1990) (ruling district court erred by rejecting affidavit containing hearsay statements from company's salesforce because "there is no indication that . . . salesforce would be unavailable to testify at trial").  This Court need not rule on whether that testimony, the DPA, or the State AG Complaint "will actually be admitted at trial" because that "question need not be answered now."  *FOP*, 842 F.3d at 239.

Perrigo also argues that Thomassey's conversations with Polman are irrelevant because Polman did not have pricing authority.  [Perrigo Reply Br. at 4-5.]  That is a disputed fact calling for a jury resolution.  Plaintiffs have presented facts suggesting that pricing for the

company's generic drugs were set by a committee, and at times, Polman sat on that committee with Wesolowski, who, according to Perrigo, had the ultimate authority to set prices.  [Pls. SOF ¶ 217 (citing Ex. 171); see also Defs. Resp. ¶ 217 (citing Exs. 86 & 171).]  Plaintiffs have pointed to evidence suggesting that Wesolowski was in "close contact" with Polman, having spoken "to him almost everyday and sometimes multiple times a day." [Ex. 171 (Wesolowski Tr. 268:17 to 22).]  Wesolowski testified that "he had an idea of what [] Poleman was doing in terms of his business at Perrigo." [*Id.* (Wesolowski Tr. 268:23 to 269:15).]  Viewing the facts in light most favorable to Plaintiffs and affording them all reasonable inferences from that evidence, a jury could infer Polman could have influenced the generic pricing committee's decisions, or held sway over Wesolowski to influence his decisions on pricing.

In addition, Perrigo rejects Plaintiffs' "circumstantial evidence" as suggesting a price-fixing scheme by looking at each category of evidence in isolation.  [Perrigo Reply Br. at 9-14.]  But when viewed together, coupled with Plaintiffs "direct" evidence (of course all in Plaintiffs' favor), this Court cannot say a reasonable jury would find the evidence insufficient to establish the existence of a price-fixing scheme and Perrigo's involvement in that scheme with its competitors.

Still, since the Generic Rx Claim against Papa and Brown fail for lack of scienter, this Court finds Perrigo's argument that the claim against it too must fail persuasive.  [Perrigo Br. at 37.]  Because corporations "do not have their own state of mind," corporate liability for securities fraud under Section 10(b) and Rule 10b-5 must flow from the corporation's agents. *Smallen v. the W. Union Co.*, 950 F.3d 1297, 1312 (10th Cir. 2020).  The "most straightforward way" to impute scienter to a corporation is "to impute it from an individual defendant who

36

made the challenged misstatement." *Jackson v. Abernathy*, 960 F. 3d 94, 98 (2d. Cir. 2020): *see also Smallen*, 950 F.3d at 1312 (observing "the scienter of a corporation's agents must be imputed to [the corporation]"). But since the evidence against Papa and Brown (the only two remaining named individual-defendants) does not establish scienter, there is no scienter to impute to Perrigo.[5]

To get around this, Plaintiffs attempt to invoke the "corporate" or "collective" scienter doctrine to hold Perrigo liable on the Generic Rx Claim. [Pls. Br. at 65.] Plaintiffs seek to use the doctrine to impute Boothe's and Wesolowski's state of minds to Perrigo. [*Id.*] According to Plaintiffs, a jury could find Wesolowski and Boothe were complicit in the price-fixing scheme and point out the State AG Complaint names both as defendants. [*Id.*] Plaintiffs argue a reasonable jury could find Wesolowski had scienter given his oversight and communications with Polman, "Perrigo's main link to other cartel members." [*Id.*] And they argue a reasonable jury could find Boothe had scienter based on his multiple communications with a competitor the very same day Perrigo increased its cost for econazole by 600%. [*Id.*]

The corporate scienter doctrine often arises at the pleadings stage, and courts across the country take varying approaches on the doctrine's application. The Third Circuit has never accepted or rejected it. *Rahman*, 736 F.3d at 246. The late-Honorable William Walls and the Honorable Esther Salas both extensively reviewed the doctrine and the differing

---

[5] All the more reason to find Plaintiffs failed to establish that Papa and Brown acted with scienter is the undisputed evidence shows the State AG Complaint "contains no allegations that [Papa] or [Brown] engaged in, or were aware of, any wrongdoing at Perrigo." [Defs. SOF. ¶ 263; Pls. Resp. ¶ 263.] Moreover, at the motion-to-dismiss stage, the Court found an inference of scienter based on the Amended Complaint's allegations that the Department of Justice started investigating Perrigo over generic drug pricing and raided Perrigo's offices. *Roofer's*, 2018 WL 3601229, at *22. Now, the undisputed evidence shows "[t]he federal government has brought no action claiming that [Papa] or [Brown] engaged in, or were aware of, any wrongdoing at Perrigo." [Defs. SOF. ¶ 281; Pls. Resp. ¶ 281.]

approaches courts have taken—narrow, intermediate, and broad. *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675 (D.N.J. Aug. 8, 2018) (Walls, J.) (*Cognizant I*) & 2020 WL 3026564 (D.N.J. June 5, 2020) (Salas, J.) (*Cognizant II*).

The narrow approach, applicable in the Fifth and Eleventh Circuits, requires a plaintiff to identify a corporate official responsible for the challenged statement who also possessed scienter. *Cognizant II*, 2020 WL 3026564, at *25 (citing S*outhland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004); *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir. 2004)). Judge Walls rejected this narrow approach, finding it would allow corporations to escape "liability through tacit encouragement and willful ignorance," and because it "fails to address instances where widespread corporate fraud cannot be connected to individual defendants at the pleading stage." *Cognizant I*, 2018 WL 3772675, at *33 (citations and internal quotation marks omitted).

The intermediate approach taken by the Sixth Circuit looks to the state(s) of minds of certain employees to determine whether to impute scienter to the corporation. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014). Under this approach, courts may look to:

    a. The individual agent who uttered or issued the misrepresentation;

    b. Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance;

    c. Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance.

*Id.* (citations omitted).

The broad approach, applicable in the Second and Seventh Circuits, allows a plaintiff to establish scienter against a corporation without specifically identifying an individual in a pleading. *Cognizant II*, 2020 WL 3026564, at *28.   Under this approach, scienter can be imputed to a corporation in two ways:   (1) from an individual defendant, director, or officer who either made the challenged statement, or who was "involved in the dissemination of the fraud" even if not the speaker; or (2) from the statement itself in those "exceedingly rare instances" where the statement is "so dramatic that collective corporate scienter may be inferred." *Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164, at *4 (2d Cir. May 16, 2023) (quoting *Jackson*, 960 F.3d at 98-99).  If a plaintiff seeks to impute scienter to a corporation from a person who was "not the actual speaker" of the challenged statement, the plaintiff must establish "connective tissue between those employees and the alleged misstatements." *Jackson*, 960 F.3d at 98-99); *see also Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017) ("Silvercreek has not alleged a connection between the recommendations and reports (the alleged misstatements) and the knowledge of their falsity sufficient to support a strong inference that the alleged misstatements themselves were made with an intent to defraud.").

To infer scienter from the statement itself, the statement must be "so dramatic" or extreme to permit an inference that knowledgeable corporate officials approved the statement. In *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008), the Seventh Circuit gave an example of such a statement:

> Suppose General Motors announced that it had sold one million
> SUVs in 2006, and the actual number was zero.  There would be
> a strong inference of corporate scienter, since so dramatic an

> announcement would have been approved by corporate officials
> sufficiently knowledgeable about the company to know that the
> announcement was false.

*Id.* at 710.  This statement-based-only approach to impute scienter to a corporation is reserved

for "unique and extraordinary circumstances."  *Christian v. BT Grp. PLC*, 2020 WL 1969941,

at *8 (D.N.J. Apr. 24, 2020) (citing *City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 442 F.

App'x 672, 676 (3d Cir. 2011)), *aff'd sub nom.*, *Pamcah-UA Local 675 Pension Fund v. BT Grp.

PLC*, 2021 WL 3415060 (3d Cir. Aug. 5, 2021).

Setting aside these varying approaches, "at the summary judgment stage, '[t]o prove

liability against a corporation, . . .  a plaintiff must prove that an agent of the corporation

committed a culpable act with the requisite scienter, and that the act (and accompanying

mental state) are attributable to the corporation.'"  *Cognizant I*, 2018 WL 3772675, at *32

(alteration in original ) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap.*,

531 F.3d 190, 195 (2d Cir. 2008)).  This is so because the corporate scienter doctrine is a

"pleading rule."  *See Dynex Capital*, 531 F.3d at 195; *cf. In re Volkswagen "Clean Diesel" Mktg.,

Sales Practices, & Prod. Liab. Litig.*, 2017 WL 6041723, at *11-12 (N.D. Cal. Dec. 6, 2017)

(finding caselaw supported defendants' argument the corporate scienter doctrine is only a

pleading rule).  Indeed, the Second Circuit, while following the broad approach, still requires

proof that a corporate agent committed the culpable act with the required scienter before

imputing scienter to the corporation at the liability stage.  *Dynex Capital*, 531 F.3d at 195

(explaining difference between pleading rules and liability rules).

Although seeking to invoke the corporate scienter doctrine, Plaintiffs have cited no

decision applying the doctrine outside the motion-to-dismiss setting.  [Pls Br. at 31-34.]

Because the Third Circuit has neither accepted nor rejected the corporate scienter doctrine, the Court is inclined to grant Perrigo's summary judgment on the Generic Rx Claim for lack of scienter. Plaintiffs seem to believe that Boothe's and Wesolowski's state of minds can be imputed to Perrigo, but they offer no explanation on how. They do not show any connection between Boothe's and Wesolowski's alleged misdeeds and their knowledge of the price-fixing scheme to the challenged statements at issue. Plaintiffs have left this Court clueless because they have not shown, for example, whether Boothe or Wesolowski furnished any information to Papa and Brown, or drafted, reviewed, or approved the challenged statements. *See Cognizant II*, 2020 WL 3026564, at *27 (imputing scienter to defendant-company under Fifth Circuit's narrow approach based on allegations non-defendant executive furnished information he knew to be false for the company's financial statements). It is truly unfortunate that Plaintiffs have not adequately addressed this theory at this late stage of the case. Nonetheless, as an exercise of caution, and acutely aware that further delay will result, the Court will require additional briefing on the corporate scienter doctrine and the evidence (if any) Plaintiffs rely on to support its corporate scienter argument. Until then, the Court reserves on Perrigo's summary judgment motion on the Generic Rx Claim.

## C. Omega Integration Claim

Omega was one of Europe's largest over-the-counter healthcare companies having a commercial presence in about 35 countries. [Def. SOF ¶ 23.] In 2014, Perrigo announced it was acquiring Omega for $4.5 billion. [*Id.* ¶ 36.] Perrigo "told its investors that the acquisition would expand Perrigo's market access across a larger global platform with critical mass in all key European countries." [*Id.* (cleaned up).] In March 2015, Perrigo closed its acquisition

41

of Omega.  [*Id.* ¶ 53.]

Following the acquisition, Perrigo incurred hundreds of millions in impairment charges.  [Pls. SOF ¶ 178.]  *See also Roofer's*, 2018 WL 3601229, at *5.  In addition, Perrigo announced changes its 2016 estimate of future earnings several times, reducing the earning guidance per share more than once.  *Roofer's*, 2018 WL 3601229, at *5.  And Perrigo announced its plan to restructure some of Omega's assets.  *Id.*

Plaintiffs challenge several of Defendants' statements on the integration, such as Papa's statements that Omega "has been accretive to our growth rate" and Perrigo "delivered" on its Omega integration plans.  [Am. Compl. ¶¶ 133, 141.]  They claimed those statements were false and misleading because Defendants knew about serious impediments to the integration before making the statements.  [*Id.*]

At the motion-to-dismiss stage, the Court found Defendants' statements on the "present success" of the integration to be "actionable representations."  *Roofer's*, 2018 WL 3601229, at *14.  And the Court found Plaintiffs alleged enough facts to establish scienter because Papa's and Brown's statements on the integration suggested personal knowledge, which supported an inference of scienter.  *Id.* at *23.  On top of that showing, the Court credited allegations of former employees "who allegedly confirmed that Papa and Brown were aware of the problems with the Omega integration."  *Id.*   And the Court found the Omega integration to be a "core operation" of Perrigo, which also supported an inference of scienter.  *Id.* at *24.

Defendants move for summary judgment arguing Papa's and Brown's statements were not false and they did not possess scienter.   The Court agrees as to Brown, but finds genuine

issues of facts exist as to Papa and Perrigo.

### 1. Brown

Plaintiffs contend Brown committed securities fraud when she made a single statement about Perrigo's integration of Omega.  According to Plaintiffs, Brown's statement on the integration—that "I should say in line with our going online integration process.  Back office is working smoothly.  We are bringing them on to all of our back office systems."—was materially false and misleading.  [Am. Compl. ¶¶ 139-40; see also Pls Br. at 25-26.]  Plaintiffs claim that statement was false and misleading because when Brown made it, she knew about impediments to the integration.  [Pls. Br. at 26.]

Plaintiffs hang their hat on Omega's co-founder and former Chairman and Chief Executive Officer Marc Coucke's (Coucke) behavior at an executive committee meeting a week before Brown's challenged statement where Coucke "erupted" stating "nothing is working right with integration."  [Pls Br. at 15, 25-26; see also Ex. 165 (Farrington Tr. 234:15 to 23 (Docket No. 359-13).]  Plaintiffs also point to Brown's email to Coucke following the meeting to discuss his outburst.  [Ex. 206 (Docket No. 359-52).]  They also point to documents discussing Omega's performance before the integration, cashflow issues, site plan meeting cancellations, and IT integration issues.  [Pls. Br. at 26; see also Ex. 207 (Docket No. 359-54); Pls. SOF ¶¶ 100-01, 103, 105-06, and 115.]

Viewing Plaintiffs' evidence in light most favorable to them, this Court finds it insufficient to show scienter or falsity.  Plaintiffs unreasonably—indeed, unfairly— stretch the inferences to be drawn from Coucke's eruption.  At best, Coucke's behavior shows his frustration with the integration and losing control over his former company.  Indeed, Thomas

Farrington (Farrington), the Perrigo executive in charge of the Omega integration, described Coucke's outburst as "an emotional one" because Coucke "never focused on things that were working well," rather, he "only talk[ed] about the things that were negative in his view." [Ex. 165, Farrington Tr. 237:22 to 238:17.]  Brown has also given Coucke's eruption context. Following his outburst, Coucke wrote to Farrington stating Perrigo "wants to change us" and never "asks [Omega] how to do something," but insists on "the Perrigo way." [Defs. SOF ¶¶ 78-79.]  Coucke added that while Omega acquisition was "not yet 3 months old," there were a "list of areas . . . where Perrigo already tried to change Omega." [*Id.* ¶ 79 (cleaned up).] Despite the "spin" Plaintiffs wish to put on Coucke's behavior, the evidence shows Perrigo progressed with key integration tasks.

Even if a reasonable jury could infer the integration had setbacks from Coucke's behavior, other information Brown had when she spoke shows she was not reckless or that her statement was false.  Indeed, weeks before she spoke, Brown received information that the integration was progressing.  For example, Brown received an update that Omega's conversion to GAAP standards "was progressing," and Perrigo's finance team spoke with Omega "on month and quarterly reporting." [Defs SOF ¶¶ 73.]  She then received information about a "VERY positive call" from Omega's CFO about "the finance integration work streams with Omega." [*Id.* ¶ 74.]  She again learned the Omega's conversion to GAAP was "progressing" with a pass off to Omega" shortly before her challenged statement. [*Id.* ¶ 75.]  Brown then learned that Omega's CFO was "very positive on approach and progress of integration" and "from a finance perspective, integration was very positive." [*Id.* ¶ 76 (cleaned up).]

The above evidence presents conflicting assessments on the success of the integration. On the one hand, Brown was present when Coucke erupted claiming "nothing is working right with integration." [Ex. 165 (Farrington Tr. 234:15 to 23.]  On the other, Brown received several updates that integration was progressing.  Given the conflicting information Brown had when she spoke, this Court finds that no reasonably jury could find Brown was reckless when she spoke about the integration. *Bristol-Myers Squibb*, 2005 WL 2007004, at *56, *60, *62 (granting summary judgment for lack of scienter because speaker's statement—that certain medication would be a "blockbuster" for the treatment of heart failure—was not reckless given the conflicting assessments speaker had received on the medication).  Indeed, the recklessness needed to establish scienter is high, requiring "an extreme departure from the standards of ordinary care."  *Ikon*, 277 F.3d at 666.  Plaintiffs' evidence against Brown does not pass that high bar.  At best, the evidence suggests Brown's statement was ill-advised given the conflicting information she had, which is not enough to establish scienter.  *In re Level Commc'n, Inc. Sec. Litig.*, 667 F.3d 1331, 1345 (10th Cir. 2012) (affirming dismissal of securities fraud claims because "a close reading of some of defendants' progress estimates suggests that they may have been inconsistent with a few internal reports does not lead us to a strong inference that defendants' statements were intentionally fraudulent or extremely reckless," but rather, "defendants were negligent").  Thus, the Court grants summary judgment on the Omega Integration Claim against Brown.  *Merck*, 2015 WL 2250472, at *14.[6]

### 2. Papa

---

[6] In addition, Plaintiffs mischaracterize some of the record evidence.  For example, Plaintiffs claim that an integration update Brown received in May 2015 listed "IT Security Integration" as a "Must Do" activity that was on hold.  [Pls SOF ¶ 103.]  However, that update states that IT Security Integration was "Not a current 'Must Do' activity."  [Ex. 55.]

Plaintiffs challenge several of Papa's statements on the success of the Omega integration.  [Pls. Br. at 13-19, 23-31.]   They challenge Papa's April 2015 statement that Omega "has been accretive to our growth" as false and misleading.  [Am. Compl. ¶ 133.] Plaintiffs also challenge Papa's May 2015 statement where he "touted Omega's performance." [Pls. Br. at 14 (citing Am. Compl. ¶ 133).]  And they contend Papa's August 2015 statement that Perrigo "delivered on our Omega integration plans, achieved great operational efficiencies and productivity improvement" was also materially false and misleading.  [Am. Compl. ¶¶ 141-42.]   In addition, they assert Papa's September 2015 statement that Perrigo "successfully integrated 27 acquisitions" and "supplemented [Omega] with our manufacturing infrastructure" was false and misleading.  [*Id.* ¶¶ 143-145.]

After viewing the evidence in Plaintiffs favor and affording them every reasonable inference from that evidence, the Court finds material facts are disputed as to whether Papa's statements were false and whether he acted with scienter.   Resolving these disputes would necessarily require the Court to make credibility determinations and "weigh the evidence and determine the truth of the matter," which is not permitted at the summary judgment stage. *Anderson*, 477 U.S. at 249.  As noted earlier, scienter is often a jury call because "whether a party acted with scienter, intertwined as it may be with an assessment of witness credibility, often cannot be undertaken appropriately on summary judgment proceedings[.]"  *Ikon*, 277 F.3d at 668.   Suffice it to say, Papa's evidence is not so one-sided on a scienter and falsity, and whether his statements were false and he acted recklessly when he spoke on the success of the Omega integration given the information he had is best left for a jury.

Setting that finding aside, the Court rejects Plaintiffs' attempt to reinject Defendants'

October 2015 and January 2016 statements back into this case.  [Pls. Br. at 17-19.]  The Court already dismissed Plaintiffs' challenges to those statements under the PSLRA's safe-harbor for forward-looking statements.  *Roofer's*, 2018 WL 3601229, at *15 (ruling "with regard to purely forward-looking statements, or portions of statements, the Court finds that [Defendants'] warnings were sufficient to insulate Defendants' projections regarding synergies and potential revenue from liability").  Plaintiffs (once again) mischaracterize the record to get around the Court's prior ruling.

Take for example Plaintiffs' challenge to Defendants' October 2015 statement. According to Plaintiffs, Defendants committed securities fraud when they "told investors that aggressive projections for Omega and the assumption that the Omega integration 'will proceed as planned and will not be subject to unforeseen delays.'"  [Pls. Br. at 17 (citing Am. Compl. ¶ 147 & Ex. 69).]  By selectively quoting the evidence, Plaintiffs create an illusion that the statement focuses solely on the integration itself.   But the statement  (housed in a Profit Forecast in an SEC Form 8-K) is an "assumption" that "[t]he integration and realization of synergies in relation to the acquisition of, Omega Pharma, certain branded consumer healthcare products from GSK, and Yokebe will proceed as planned and will not be subject to unforeseen material delays."  [Ex. 69  at 7.]  The Court already dismissed Plaintiffs' challenges to these types of statements.  *Roofer's*, 2018 WL 3601229, at *15  (dismissing, among other things, "the purely forward-looking revenue and synergy projections described in the Amended Complaint").  Plaintiffs challenge to Papa's January 2016 statement fares no better because the statement focuses on revenue synergies.  [Am. Compl. ¶¶ 149-50.]  Plaintiffs should have known that they cannot now resurrect their challenges to those statements.

### 3. Perrigo

Because this Court finds genuine issues of fact exist on the falsity of Papa's statements, and whether he possessed scienter when he spoke, this Court denies Perrigo's summary judgment motion. If a jury concludes Papa's statements were false and he acted with scienter, Papa's scienter may be imputed to Perrigo. *Jackson*, 960 F. 3d at 98; *see also Cognizant I*, 2018 WL 3772675, at *32.

### D. Loss Causation

Perrigo also moves for summary judgment contending Plaintiffs cannot prove loss causation or damages for their securities fraud claims. [Perrigo Br. at 38-55.] To prevail on their claims, Plaintiffs must show Defendants' challenged statements "actually caused the economic loss suffered." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425 (3d Cir. 2007). "The fact that a misrepresentation occurred and the share price declined is not enough." *Omanoff v. Patrizio & Zhao, LLC*, 2015 WL 1472566, at *6 (D.N.J. Mar. 31, 2015). Rather, to show loss causation, Plaintiffs must prove "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Id.* (quoting *McCabe*, 494 F.3d at 426). As the Third Circuit has repeatedly warned, loss causation is a fact-sensitive inquiry often reserved for the trier of fact. *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 886 (3d Cir. 2000) ("Whether the plaintiff has proven causation is usually reserved for the trier of fact"); *see also McCabe*, 494 F. 3d at 427 n.4.

The Court denies Perrigo's summary judgment on loss causation for three reasons. First, the Court finds genuine issues of fact are in dispute on some corrective disclosures precluding summary judgment on loss causation. For example, Plaintiffs' expert, Dr.

48

Zachary Nye, Ph.D, concludes that news of Papa's resignation from Perrigo caused the company's stock to drop around 5.8%. [Ex. 134 ¶ 61.] Canvassing multiple analysts' and financial institutions' reporting on Papa's resignation, Nye finds that Papa's departure was linked to problems with the Omega integration. [*Id.* ¶¶ 59, 62.] Indeed, Nye points to several analysts' reports linking Papa's resignation to Perrigo's problems with Omega. [*Id.* ¶ 59.] Perrigo contends there were other factors at play causing Perrigo's stock price to decline based on reports that Papa planned to resign, such as news that Papa's potential successor being "largely unknown" and whether he had the ability to operate Perrigo's business. [Perrigo Br. at 46.] This all may be true, but the parties' competing reasons for the stock decline will need to be resolved by a jury. *EP Medsystems*, 235 F.3d at 886.

Second, Perrigo and Plaintiffs have both submitted detailed, but conflicting expert reports on loss causation, making summary judgment inappropriate. *Leader Tech., Inc. v. Facebook, Inc.*, 2011 WL 1514701, at *2 (D. Del. Mar. 14, 2011) (denying summary judgment and ruling that "conflicting expert testimony raises genuine issues of material fact that are appropriate for consideration by a jury in the first instance and, hence, preclude summary judgment"); *see also In re Biogen '755 Patent Litig.*, 2018 WL 3586271, at *9 (D.N.J. July 26, 2018). Moreover, Perrigo seeks to exclude Nye as an expert witness, arguing he is unqualified to render expert testimony and his opinion is unreliable. [Perrigo Br. at 68-74.] Until this Court holds *Daubert* hearings on each expert witness Perrigo seeks to exclude, the Court declines to grant summary judgment on loss causation, which will require expert testimony.

And third, as noted above, this Court is inclined to grant Perrigo's summary judgment on the Generic Rx Claim against it for lack of scienter. The Court is reserving on that aspect

49

of the motion pending further briefing and argument.  If the Court grants Perrigo's motion and dismisses the entire Generic Rx Claim, that decision will affect the loss causation analysis.  Indeed, several of Plaintiffs' corrective disclosures focus on Perrigo's generic drug business.  [Pls. Br. at 74-81 (April 25, May 12, August 10, 2016, March 3, and May 3, 2017).]  Thus, at this time, the Court denies Perrigo's summary judgment motion on loss causation without prejudice.

## V.  CONCLUSION

For the above reasons, the Court **GRANTS** Defendant Judy Brown's summary judgment motion [Docket No. 344] and **DISMISSES** all claims against her, **GRANTS, in part, and DENIES, in part,** Defendant Joseph Papa's summary judgment motion [Docket No. 346], **RESERVES, in part, and DENIES, in part,** Perrigo Company PLC's summary judgment motion [Docket No. 342], and **RESERVES** on Perrigo's motion to exclude Plaintiffs' experts until the Court holds *Daubert* hearings on each expert [Docket No. 342].

An accompanying Order as of today's date shall issue.

**s/Renée Marie Bumb**
RENÉE MARIE BUMB
Chief United States District Judge

Dated: August 17, 2023